(No. 89262.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. BRIAN K. SORENSON, Appellant.

*Opinion filed June 21, 2001.*

GARMAN, J., took no part.

Daniel D. Yuhas, Deputy Defender, and Judith L. Libby and Keleigh L. Biggins, Assistant Defenders, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield (Joel D. Bertocchi, Solicitor General, and William L. Browers and Mary A. Fleming, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE THOMAS delivered the opinion of the court:

The defendant, Brian K. Sorenson, was charged with

one count of unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 1996)), after police discovered cocaine in one of his unlaced hiking boots during a pat-down search following a traffic stop. The circuit court of Sangamon County denied the defendant's motion to suppress the evidence seized from the boot, finding that the search was valid because, under the totality of the circumstances, the officer had a reasonable belief that the search was necessary to protect himself from harm. Following a stipulated bench trial, the defendant was convicted of the charged offense and sentenced to two years of probation. The defendant appealed to the appellate court, and the appellate court affirmed the circuit court's denial of the motion to suppress, along with the defendant's conviction and sentence. No. 4—98—0684 (unpublished order under Supreme Court Rule 23). For the reasons that follow, we affirm the judgment of the appellate court.

## BACKGROUND

At the suppression hearing, Springfield police officer Jim Cordery testified that on the evening of September 16, 1997, around 9:10 p.m., he was conducting a surveillance from his police vehicle of a "known drug house" located at 1524 E. Moffat Street, in Springfield, Illinois. Cordery explained that he lived in the area and that he had been told by numerous neighbors and other sources that the occupants of the house were dealing drugs at the location. He also had been informed that there was an extremely high amount of foot, bicycle and car traffic coming to the house, which involved the visitors staying for two or three minutes and then leaving. Cordery noted that the police had previously arrested the occupants of the house for dealing narcotics.

Officer Cordery stated that while he was parked outside the house, a vehicle pulled up with three persons inside. The defendant, a white male with red hair, was

the sole backseat passenger. Cordery watched the defendant exit the vehicle and go inside the house. The defendant remained inside the house for about three or four minutes before returning to the same vehicle. Cordery suspected that a drug transaction had taken place in the house so he decided to follow the vehicle when it pulled away. After the driver failed to signal his intention to turn left at an intersection, the officer stopped the car. When asked if he felt particularly threatened at the time he made the traffic stop, Cordery responded affirmatively, stating, "I did feel uneasy, yes sir." He noted that his concern arose out of the location of the stop, that it was a dark road, that there were three persons in the vehicle, and that in his experience, persons involved in drugs are known to carry weapons. Cordery acknowledged that the occupants of the vehicle had not made any menacing or threatening gestures toward him, but he further stated, "[a]nytime you are on a dark road with three people in a vehicle *** there is a threat to my safety[;] [o]fficers die all the time from situations like that."

Officer Cordery further testified that after he approached the vehicle, the driver produced his driver's license and proof of insurance. Cordery then asked him if he had "any weapons, drugs, needles." At that point, the driver consented to a pat-down search, which did not reveal any weapons or contraband.

Cordery stated that following the pat-down of the driver, he turned his attention toward the defendant because the defendant was on his side of the vehicle and therefore would be the "quickest threat" to the officer. Cordery asked the defendant if he had any weapons, drugs, needles or anything on him that could hurt the officer. The defendant responded that he did not. According to Cordery, the defendant then gave his permission to be searched. The defendant stepped out of the vehicle and placed his hands on the trunk of the car. Cordery

then conducted a frisk of the defendant. During the course of the frisk, Cordery asked the defendant to remove his boots and kick them to the side. Cordery noted that he asked the defendant to remove his boots because they were unlaced. The officer added that, in his experience, any time boot laces are untied there is a very strong possibility that a weapon may be located inside and that it allows quick access. He further noted that knives, razors and small caliber handguns fit in boots. After the defendant removed his boots, Cordery observed a white, rock-like substance in one of the boots. The officer recognized the substance as possibly being cocaine, and it subsequently tested positive for the presence of cocaine.

The defendant was the only other witness to testify at the suppression hearing. The defendant testified that on the evening in question, he went inside the house located at 1524 East Moffat Street for about 5 or 10 minutes. When he left the house, he got into a vehicle with two of his friends. He stated that he thought the officer pulled the vehicle over because the driver had activated his signal late into the turn. The officer pulled the vehicle over about one block from the house the defendant had left. When the officer finished searching the driver, he told the driver to sit back down in the car. According to the defendant, the officer then told the defendant to "step out of the vehicle" and put his hands on the trunk. The defendant complied with the officer's instructions. The officer then conducted a pat-down search of the defendant. When the officer finished the pat-down, he noticed that the defendant's boots were unlaced. The officer then asked the defendant to remove his boots. The defendant described his boots as steel-toed hiking boots that came above his ankles.

At the conclusion of the hearing, the trial court denied the defendant's motion to suppress. It found that

the State had failed to meet its burden of proof as to whether the defendant consented to the search, but it further found that the search of the defendant was valid under the standards enunciated in *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). In its written order denying the defendant's motion to reconsider, the trial court noted the following objective circumstances surrounding the stop, in concluding that Officer Cordery possessed a reasonable belief that the search was necessary to protect himself from harm:

"[T]he officer testified that he observed the defendant exit a known drug house, that he stopped the vehicle on a dark street, that [the defendant] was in closest proximity to the officer after the driver exited the vehicle, that he is trained to suspect that drug purchasers are armed with greater frequency than the norm, that his training instructs him that weapons are often carried in boots and that the fact that the boots were unlaced induced him to search those boots for weapons."

The cause subsequently proceeded to a stipulated bench trial. The defendant agreed to the stipulation presented by the prosecutor, with one notable exception. In that regard, defense counsel told the trial court that the defendant had "previously testified that consent was not volunteered, and that is the issue that will be appealed, along with some other issues along with the search." The trial court accepted the stipulation and found the defendant guilty of unlawful possession of a controlled substance.

The appellate court affirmed the defendant's conviction and the trial court's denial of the defendant's motion to suppress. We granted the defendant leave to appeal. 177 Ill. 2d R. 315.

## ANALYSIS

The defendant challenges the propriety of the trial court's denial of his motion to suppress. Traditionally, this court has stated that when a trial court's ruling on a

motion to suppress evidence involves factual determinations and credibility assessments, the ultimate ruling will not be disturbed on appeal unless it is manifestly erroneous. See *People v. Buss*, 187 Ill. 2d 144, 204 (1999); *People v. Gonzalez*, 184 Ill. 2d 402, 411-12 (1998). This deferential standard of review is grounded in the reality that the trial court is in a superior position to determine and weigh the credibility of witnesses, observe the witnesses' demeanor, and resolve conflicts in the witnesses' testimony. *Gonzalez*, 184 Ill. 2d at 412. Most recently, however, this court has applied the *de novo* standard of review to the ultimate ruling on a motion to suppress, relying on the Supreme Court's decision in *Ornelas v. United States*, 517 U.S. 690, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996). See *In re G.O.*, 191 Ill. 2d 37, 46-50 (2000). In *Ornelas*, the Court held that when an appellate court reviews a ruling on a motion to suppress involving a question of probable cause or reasonable suspicion, the reviewing court should review *de novo* the ultimate finding with respect to probable cause or reasonable suspicion. *Ornelas*, 517 U.S. at 699, 134 L. Ed. 2d at 920, 116 S. Ct. at 1663. The Court cautioned, however, that findings of historical fact should be reviewed only for clear error and that reviewing courts must give due weight to inferences drawn from those facts by the fact finder. *Ornelas*, 517 U.S. at 699, 134 L. Ed. 2d at 920, 116 S. Ct. at 1663; *In re G.O.*, 191 Ill. 2d at 47-48. Accordingly, we will accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence; however, we will review *de novo* the ultimate question of the defendant's legal challenge to the denial of his motion to suppress. *In re G.O.*, 191 Ill. 2d at 50.

The defendant argues that Officer Cordery lacked a reasonable belief that the defendant posed a danger necessary to justify a pat-down search under *Terry*. The de-

fendant further argues that the officer exceeded the bounds of a valid *Terry* frisk for weapons when he directed the defendant to remove his boots.

The fourth amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Reasonableness under the fourth amendment generally requires a warrant supported by probable cause. *People v. Flowers*, 179 Ill. 2d 257, 262 (1997). One exception to the warrant requirement was recognized by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), which held that " 'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot ...,' the officer may briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions." *Minnesota v. Dickerson*, 508 U.S. 366, 372-73, 124 L. Ed. 2d 334, 344, 113 S. Ct. 2130, 2135 (1993), quoting *Terry*, 392 U.S. at 30, 20 L. Ed. 2d at 911, 88 S. Ct. at 1884. *Terry* further held that when an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or others, the officer may conduct a pat-down search to determine whether the person is in fact carrying a weapon. *Minnesota v. Dickerson*, 508 U.S. at 373, 124 L. Ed. 2d at 344, 113 S. Ct. at 2136; *Terry*, 392 U.S. at 24, 20 L. Ed. 2d at 908, 88 S. Ct. at 1881. The sole justification for the search allowed by the *Terry* exception is the protection of the police officer and others in the vicinity, not to gather evidence. *Flowers*, 179 Ill. 2d at 263. If the protective search goes beyond what is necessary to determine if a suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed. *Minnesota v. Dickerson*, 508 U.S. at 373, 124 L. Ed. 2d at 344, 113 S. Ct. at 2136.

The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. *Terry*, 392 U.S. at 27, 20 L. Ed. 2d at 909, 88 S. Ct. at 1883. In determining whether the officer acted reasonably in such circumstances, due weight must be given to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience. *Terry*, 392 U.S. at 27, 20 L. Ed. 2d at 909, 88 S. Ct. at 1883. The *Terry* principles have now been codified in our Code of Criminal Procedure of 1963. See 725 ILCS 5/107—14, 108—1.01 (West 1996).

The defendant does not challenge the stop in this case. The stop of the vehicle in which the defendant was a passenger was justified based on Officer Cordery's observation of a traffic violation. See *Gonzalez*, 184 Ill. 2d at 413. Furthermore, it is well established that following a lawful traffic stop, police may, as a matter of course, order the driver and any passengers out of the vehicle pending completion of the stop without violating the protections of the fourth amendment. *Gonzalez*, 184 Ill. 2d at 413-14. The question of whether the investigatory stop was valid, however, is a separate question from whether the search for weapons was valid. *Flowers*, 179 Ill. 2d at 263. The fact that an officer has reason to stop a person does not automatically justify the further intrusion of a search for weapons. *Flowers*, 179 Ill. 2d at 263. The officer may subject the person to a limited search for weapons, commonly referred to as a "frisk," only if the officer reasonably believes that the person is armed and dangerous. *Flowers*, 179 Ill. 2d at 262.

Turning to the question of whether the frisk was valid, we initially note that the defendant claims that he is not contesting the facts relating to that issue, while at the same time arguing that the record does not support

the trial court's finding that he left a known drug house prior to the stop or that he might have been involved in any illegal activity. The trial court determined that the defendant had left a known drug house and implicitly found that the officer had good reason to suspect that the defendant had been involved in purchasing illegal drugs. The trial court's findings were supported by Officer Cordery's testimony that numerous sources had informed him that the occupants of the house were dealing drugs from that location and that they had been arrested on a prior occasion for dealing narcotics. The defendant's behavior when he visited the house for three or four minutes before returning to his vehicle was consistent with a drug purchase and with similar suspicious activity that was routinely occurring at the house. The officer specifically testified that he believed a drug transaction may have taken place. Given the appropriate deference to the facts found and the inferences drawn by the trial court, we find that its factual determinations were well supported by the record and were not against the manifest weight of the evidence.

The defendant also maintains that the record indicates that the officer was not so much concerned with his safety as he was in searching for illegal drugs. That notion, however, is belied by the record. Officer Cordery specifically testified that he turned his attention toward the defendant during the course of the stop because the defendant was on his side of the vehicle and was the "quickest threat" to the officer. The remainder of the officer's testimony indicates that he clearly was primarily concerned with the possibility that the defendant possessed a weapon. The fact that the officer may have also believed that the defendant possessed illegal drugs did not negate the officer's concern for his safety. Here, the trial court's findings indicated that Officer Cordery conducted the search for the discovery of weapons, and

we note that that finding was not against the manifest weight of the evidence.

Relying on this court's decisions in *People v. Flowers*, 179 Ill. 2d 257 (1997), and *People v. Galvin*, 127 Ill. 2d 153 (1989), the defendant argues that Officer Cordery improperly based his decision to search the defendant not on any specific concerns for his safety but rather on a series of general suppositions which were tantamount to a policy or procedure of searching every person during a routine traffic stop. The defendant further argues that there is not a sufficient nexus between illegal drug activity and a reasonable belief that a suspect is armed and dangerous.

In *Flowers*, police received a report at 1:22 a.m. from an anonymous caller that a black male wearing a white T-shirt was riding a bicycle in a certain location where the caller heard what sounded like glass breaking. *Flowers*, 179 Ill. 2d at 260. Three police officers responded to the report. *Flowers*, 179 Ill. 2d at 260. They investigated and found no evidence that a possible crime had been committed or attempted. One of the officers then saw the defendant, who matched the description given by the caller. *Flowers*, 179 Ill. 2d at 260. The officer stopped the defendant, and was joined by another officer. The first officer then conducted a pat-down search of the suspect and discovered a small amount of cocaine. *Flowers*, 179 Ill. 2d at 260-61. At the suppression hearing, the officer who conducted the pat-down expressly testified that he had no reason to believe that the defendant had a weapon, but that he frisked the defendant simply because it was his routine practice to frisk persons stopped for investigatory questioning. *Flowers*, 179 Ill. 2d at 264-66.

This court upheld the trial court's suppression of evidence in *Flowers*, finding that its ruling was not manifestly erroneous. *Flowers*, 179 Ill. 2d at 270. In so doing, this court relied on the fact that the officer candidly

admitted that he had no reasonable belief that the defendant was armed. *Flowers*, 179 Ill. 2d at 264-65. The court found that while the officer's subjective belief was not dispositive of the validity of the frisk, it was probative. *Flowers*, 179 Ill. 2d at 264-65. The court found it most problematic that the officer frisked the defendant simply because of a routine practice and not because of any particular suspicion that the defendant was armed. *Flowers*, 179 Ill. 2d at 266. Finally, the court in *Flowers* relied upon *Galvin*, which declined to adopt a legal presumption that every possible burglary suspect is armed and dangerous, so as to justify a search for weapons under the *Terry* exception. *Flowers*, 179 Ill. 2d at 269-70. *Flowers* noted that the *Galvin* court emphasized that the reasonableness of the search must be judged by all the particular facts and circumstances surrounding it. *Flowers*, 179 Ill. 2d at 270, citing *Galvin*, 127 Ill. 2d at 173.

In *Galvin*, the police followed a burglary suspect for two or three miles out of an area where a number of recent burglaries had taken place, and effectuated a stop of the defendant's vehicle and a frisk of his person. *Galvin*, 127 Ill. 2d at 160. A total of three squad cars and five police officers were present at the scene of the stop. *Galvin*, 127 Ill. 2d at 160-61. Three of the officers had their guns drawn. *Galvin*, 127 Ill. 2d at 168. The officer who conducted the frisk testified that he did not believe that the defendant was armed and dangerous. *Galvin*, 127 Ill. 2d at 166. The trial court granted the defendant's motion to suppress the evidence seized as a result of the frisk. *Galvin*, 127 Ill. 2d at 166.

This court upheld the suppression of evidence in *Galvin*, concluding that the trial court's ruling that the frisk was invalid was not against the manifest weight of the evidence. *Galvin*, 127 Ill. 2d at 174. The court relied on all the circumstances surrounding the frisk to support its holding, noting in particular that multiple armed of-

ficers were present at the scene of the frisk, the stop was far removed from the location where the defendant's activities gave rise to the police officers' suspicions, and the officer who conducted the frisk did not believe that the defendant was armed. *Galvin*, 127 Ill. 2d at 164-74.

We believe that a comparison of the *Flowers* and *Galvin* cases with the present case supports the notion that the frisk was proper here. *Flowers* and *Galvin* are distinguishable from the present case on several key points. By the time of the frisk in *Flowers*, the officers had already investigated the report of a possible crime and had determined that no crime had occurred, whereas the present defendant was still suspected of purchasing drugs when the officer stopped the vehicle he was riding in to investigate a traffic violation. More importantly, however, Officer Cordery, unlike the officers in *Flowers* and *Galvin*, did not testify that he did not believe the defendant was armed. Instead, the officer testified that he felt particularly threatened at the time he made the traffic stop. The officer noted that his concern for his safety arose out of the location of the stop—that it was a dark road, that he was alone facing three persons in a vehicle who had come from a known drug house, and that, in his experience, persons involved with illegal drugs are known to carry weapons. In contrast, in both *Flowers* and *Galvin*, multiple officers were present at the time of the frisks, and, therefore, the officers did not have the same concern for their safety as did Officer Cordery, who was alone on a dark road. The possible sources of harm to officers is increased by the presence of passengers, and this is particularly true where an officer is alone in conducting a traffic stop. See *Gonzalez*, 184 Ill. 2d at 416, 420.

Additionally, the record did not show that Officer Cordery had a routine policy of frisking persons stopped for investigatory questioning, as did the officer in *Flowers*. Instead, the evidence showed that the officer feared

for his safety in this case based on the combination of all the factors that confronted him at the time of the stop. We find no merit to the defendant's contention that the officer's reliance on the cited factors for the search amounted to a policy of searching every person pursuant to a routine traffic stop.

The defendant relies on *People v. Wright,* 183 Ill. 2d 16 (1998), for his contention that we should reject any nexus between illegal drug activity and a reasonable belief that a suspect is armed and dangerous. The defendant's reliance on *Wright,* however, is misplaced. *Wright* involved the standard necessary to enter someone's home unannounced, and we do not find it applicable to the propriety of a *Terry* frisk in conjunction with a traffic stop. Instead, we note that it has been held that when a police officer possesses a reasonable articulable suspicion that automobile occupants were dealing drugs just prior to the stop, the officer's belief that the suspects were armed and dangerous was reasonable because weapons and violence frequently are associated with drug transactions. *United States v. Brown,* 913 F.2d 570, 572 (8th Cir. 1990).

*Ybarra v. Illinois,* 444 U.S. 85, 62 L. Ed. 2d 238, 100 S. Ct. 338 (1979), also relied upon by the defendant, is distinguishable. In *Ybarra,* police officers had a search warrant authorizing them to search a tavern and the person of the bartender. *Ybarra,* 444 U.S. at 88, 62 L. Ed. 2d at 243, 100 S. Ct. at 340. One of the officers, however, proceeded beyond the scope of the warrant and conducted a pat-down search of all the patrons at the bar. *Ybarra,* 444 U.S. at 88, 62 L. Ed. 2d at 244, 100 S. Ct. at 341. The pat-down searches revealed that one of the patrons had a packet of illegal narcotics in his pants pocket. *Ybarra,* 444 U.S. at 89, 62 L. Ed. 2d at 244, 100 S. Ct. at 341. The Supreme Court held that the frisk of the patron was invalid under *Terry* because there was no "reasonable belief

or suspicion directed at the person to be frisked," even though that person happened to be on the premises of the tavern. *Ybarra*, 444 U.S. at 94, 62 L. Ed. 2d at 247, 100 S. Ct. at 343.

*Ybarra* does not control the present case because here Officer Cordery's suspicions were specifically directed at the defendant. Moreover, the officer was alone on a dark roadside, conducting a valid investigative stop involving a vehicle with several occupants. Thus, *Ybarra* is not factually similar to the present case.

We point out that Officer Cordery did not need to be absolutely certain that the defendant was armed in order to conduct a frisk under the *Terry* exception. Rather, the question is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety was in danger. Under the totality of the circumstances presented here, we find that Officer Cordery was warranted in his belief that his safety was in danger. Accordingly, we find that the frisk of the defendant was proper in this case.

We next must address the defendant's argument that Officer Cordery exceeded the bounds of a permissible *Terry* frisk for weapons when he directed the defendant to remove his hiking boots. The defendant maintains that the limited exception for a frisk for weapons permits a pat-down only of a person's outer clothing, citing *Terry*, 392 U.S. at 30-31, 20 L. Ed. 2d at 911, 88 S. Ct. at 1884-85, and *Sibron v. New York*, 392 U.S. 40, 65, 20 L. Ed. 2d 917, 936, 88 S. Ct. 1889, 1904 (1968).

The defendant is mistaken in his assertion that the scope of a *Terry* search is always limited to a pat-down of a person's outer clothing. See 4 W. LaFave, Search & Seizure § 9.5(b), at 270-76 (3d ed. 1996). The *Terry* Court noted that a weapons search must, like any other search, "be strictly circumscribed by the exigencies which justify its initiation." *Terry*, 392 U.S. at 26, 20 L. Ed. 2d at 908,

88 S. Ct. at 1882. The Court in *Terry*, however, refrained from articulating the specific limitations that might be imposed in all cases, and instead stated that "limitations will have to be developed in the concrete factual circumstances of individual cases." *Terry*, 392 U.S. at 29, 20 L. Ed. 2d at 910, 88 S. Ct. at 1884, citing *Sibron v. New York*, 392 U.S. 40, 20 L. Ed. 2d 917, 88 S. Ct. 1889 (1968). The *Terry* Court further noted that the scope of the search must be confined to "an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29, 20 L. Ed. 2d at 911, 88 S. Ct. at 1884.

Four years after its ruling in *Terry*, the United States Supreme Court in *Adams v. Williams*, 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972), considered the validity of a *Terry* search that did involve a pat-down of outer clothing. There, the Court held that police may reach into an automobile and remove a weapon that is fully concealed in a suspect's waistband without first conducting a pat-down, where the police knew of the weapon based solely on an informant's tip, and the suspect rolled down his window instead of complying with the officer's request to step out of the car. *Adams*, 407 U.S. at 147-48, 32 L. Ed. 2d at 618, 92 S. Ct. at 1924.

In *Michigan v. Long*, 463 U.S. 1032, 77 L. Ed. 2d 1201, 103 S. Ct. 3469 (1983), the United States Supreme Court again upheld a *Terry* search that went beyond a pat-down of outer clothing. The *Long* Court held that in the context of a stop of an automobile, where police have a reasonable suspicion based on specific and articulable facts to believe that a vehicle occupant may be armed and dangerous, they may conduct a protective search for weapons, not only of the suspect's person, but also of the passenger compartment of the automobile. *Long*, 463 U.S. at 1048-49, 77 L. Ed. 2d at 1219-20, 103 S. Ct. at 3480-81. In so holding, the Court noted that the *Terry*

preventive search for weapons should not be read as being restricted to the person of the detained suspect. *Long*, 463 U.S. at 1047, 77 L. Ed. 2d at 1218, 103 S. Ct. at 3480. The Court found this to be particularly true in the context of roadside encounters involving suspects in vehicles because such encounters are especially fraught with danger. *Long*, 463 U.S. at 1047-48, 77 L. Ed. 2d at 1218-19, 103 S. Ct. at 3480. A *Terry* suspect could break away from the officer and retrieve a weapon in the vehicle or may be permitted to reenter the vehicle before the *Terry* investigation is over and gain access to weapons. *Long*, 463 U.S. at 1051-52, 77 L. Ed. 2d at 1221, 103 S. Ct. at 3482.

In evaluating the validity of an officer's protective conduct under *Terry*, the touchstone of the analysis is the reasonableness under the circumstances of the particular governmental invasion of a citizen's personal security. *Long*, 463 U.S. at 1051, 77 L. Ed. 2d at 1221, 103 S. Ct. at 3481-82. Under the circumstances of the present case, we find that Officer Cordery did not act unreasonably in directing the defendant to remove his unlaced boots to determine if they contained a weapon. Given the officer's testimony that unlaced boots pose a strong possibility that a weapon may be concealed inside and that the location provides quick access to a weapon, we conclude that the officer acted reasonably in having the defendant remove the boots before completing the investigative stop and allowing the defendant to return to the vehicle.

The defendant argues that removal of his boots was not the least intrusive means available and that the officer should have pulled up the defendant's pant leg and patted down the top of his boot. We disagree. The defendant's boots were described as "steel toed" hiking boots. Thus, a pat-down of the boots may not have revealed a concealed weapon and would not lessen an of-

ficer's concern for his safety. Additionally, the defendant acknowledged that the encounter occurred along a dark roadside. Simply pulling up the pant leg, therefore, may not have eased the officer's fears, even assuming the uncertain proposition that a weapon would have had to be located high enough in the boot to be visible upon inspection in proper lighting. Under the circumstances, we find that the scope of the search was sufficiently confined to "an intrusion reasonably designed to discover guns, knives, *** or other hidden instruments for the assault of the police officer" (*Terry*, 392 U.S. at 29, 20 L. Ed. 2d at 911, 88 S. Ct. at 1884) and therefore was proper.

We note that most of the other state courts which have addressed the issue have found that a search involving the removal of a shoe or looking into a boot is within the permissible scope of *Terry* if the officer conducted the search with the intent of finding a weapon. See *In re Andre W.*, 256 Neb. 362, 367, 590 N.W.2d 827, 831 (1999), citing *C.G. v. State*, 689 So. 2d 1246 (Fla. App. 1997) (police had reasonable articulable suspicion to order suspect to remove his shoes); *Stone v. State*, 671 N.E.2d 499 (Ind. App. 1996) (upheld removal of high-top tennis shoes); *Hodges v. State*, 678 So. 2d 1049 (Ala. 1996) (held that officer was "completely justified" in pulling up suspect's pant leg to determine if he had a weapon hidden inside hard leather boot because weapons can be easily hidden there and a pat-down would not have lessened officer's safety concerns). But see *State v. Valle*, 196 Ariz. 324, 328, 996 P.2d 125, 128 (2000) (search of shoe held invalid where police had no justifiable belief that defendant was armed; rather police acknowledged that pat-down was pursuant to department policy to pat-down motorists "once we get people out of the vehicles"); *State v. Mitchell*, 87 Ohio App. 3d 484, 622 N.E.2d 680 (1993) (search of shoes invalid where officer testified that he asked defendant to remove his shoes not as part of a search for

weapons, but as part of search for evidence); *Thompson v. State*, 551 So. 2d 1248 (Fla. App. 1989) (search of shoes improper where officer admitted he was not looking for a weapon in defendant's shoe and none of the circumstances lead officer to believe that the defendant was armed); *Commonwealth v. Borges*, 395 Mass. 788, 482 N.E.2d 314 (1985) (search was beyond the scope of *Terry* where there was no evidence that officers feared for their safety in asking defendant to remove his shoes).

For example, in *Andre W.*, police as part of *Terry* patdown search ordered a drug suspect who was encountered in a "crack house" to remove his high-top tennis shoes in order to conduct a search for weapons. *Andre W.*, 256 Neb. at 364, 590 N.W.2d at 829. While patting down the suspect's socks, the officer felt an object inside, which, based on his experience, he immediately recognized as crack cocaine. *Andre W.*, 256 Neb. at 364, 590 N.W.2d at 829. The officer testified that people encountered in such circumstances frequently hide weapons in their shoes and socks. *Andre W.*, 256 Neb. at 364, 590 N.W.2d at 829. The supreme court of Nebraska concluded that the officer had a reasonable and articulable suspicion that the suspect might have a concealed weapon in his shoe or sock and that removal of the suspect's shoes and patdown of his socks "constituted a reasonable, nonintrusive search for weapons which did not violate [the defendant's] rights under the Fourth Amendment." *Andre W.*, 256 Neb. at 369, 590 N.W. 2d at 832.

Similarly, in *Stone*, police investigating a possible drug transaction conducted a pat-down search of the defendant, which included the removal of his high-top tennis shoes. *Stone*, 671 N.E.2d at 500-01. Inside the shoes, police discovered marijuana. *Stone*, 671 N.E.2d at 500-01. In holding that the search was proper under *Terry*, the Indiana appellate court noted that the officer checked the shoes for safety purposes and had reason to be

concerned for his safety. *Stone*, 671 N.E.2d at 503. The *Stone* court concluded that "it is not unreasonable for a reasonable and prudent person to suspect a weapon could be hidden in an untied high top athletic shoe. Requesting removal of the shoe is not overly intrusive given a situation where the officer sincerely fears a hidden weapon might be concealed." *Stone*, 671 N.E.2d at 503.

In the present case, Officer Cordery asked the defendant to remove his shoes out of a legitimate concern for his safety. Thus, the present case is similar to *Andre W.* and *Stone*, and we find those cases to be further support for our conclusion that the removal of the defendant's shoes did not exceed the scope of a valid *Terry* search for weapons.

### CONCLUSION

For the foregoing reasons, we hold that the trial court properly denied the defendant's motion to suppress. Accordingly, we affirm the judgment of the appellate court.

*Affirmed.*

JUSTICE GARMAN took no part in the consideration or decision of this case.