NO. 4-02-0613          Filed 6/5/07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
|          Plaintiff-Appellee, | ) | Circuit Court of |
|          v. | ) | Brown County |
| LUCAS T. ROBERTS, | ) | No. 01CF4 |
|          Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | David K. Slocum, |
| | ) | Judge Presiding. |

JUSTICE MYERSCOUGH delivered the opinion of the court:

Following a stipulated bench trial in May 2002, the trial court found defendant, Lucas T. Roberts, guilty of unlawful possession of cannabis with intent to deliver. 720 ILCS 550/5(c) (West 2000). The court sentenced defendant to 24 months' probation. Defendant appealed the court's denial of his motion to suppress, arguing the deputy exceeded the scope of his authority by questioning defendant about possible criminal activity after the traffic stop was completed. We reversed the court's denial of defendant's motion to suppress and vacated the judgment of conviction. People v. Roberts, 349 Ill. App. 3d 972, 813 N.E.2d 748 (2004). The State filed a petition for leave to appeal to the Supreme Court of Illinois. On September 27, 2006, the supreme court denied the State's petition but directed this court to vacate its judgment and reconsider defendant's appeal in

light of Illinois v. Caballes, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834 (2005), and People v. Caballes, 221 Ill. 2d 282, 851 N.E.2d 26 (2006) (Caballes III). People v. Roberts, 221 Ill. 2d 665, 853 N.E.2d 1230 (2006) (nonprecedential supervisory order on denial of leave to appeal). After reviewing the United States Supreme Court's opinion and this states's supreme court decision in Caballes III, we affirm the trial court's denial of defendant's motion to suppress.

## I. BACKGROUND

In December 2001, the trial court held a hearing on defendant's motion to suppress. Deputy sheriff Michael Scott Hainline testified that on August 25, 2000, he was assigned to routine traffic patrol in Brown County. He testified that he had undergone drug interdiction training as a significant part of his training for traffic duties. Hainline testified that this training taught him to go "beyond the initial traffic stop" and to ask different questions and to look for different answers or nonresponsiveness, to observe the body language of passengers, to look for movement within the passenger compartment, and how to identify different types of drugs and drug paraphernalia. In addition to teaching him to identify situations in which a further search may be warranted, the classes taught him techniques to effectuate that search in a manner that would reduce the level of constitutional scrutiny.

- 2 -

At 4 a.m. on August 25, 2000, as Hainline was driving eastbound along US Route 24, he noticed in his side mirror that defendant's westbound car that he had just passed did not have a working registration light. Hainline turned his car around, switching from the eastbound lane to the westbound lane, and upon confirming that the car did not have a working registration light, pulled the car over. As he initiated his squad car's overhead lights, "take-down" lights, and spotlights, Hainline observed movement in the vehicle and noted that it appeared that three subjects were in the vehicle. Hainline said the movement was not unusual.

After stopping the car, Hainline approached the vehicle on the passenger side. Hainline testified that the passenger in the front seat initially looked surprised that he had come up on his right instead of on the driver's side. Hainline then introduced himself, stated the reason for the stop, and asked the driver of the car for his license and proof of insurance. He also asked for identification from the passengers, Adam Heather in the front seat and Walter Bartz in the back.

Hainline testified that Heather did not directly look at him, except to answer questions about his identity and birth date, but instead looked straight ahead when he was not speaking. Hainline characterized this behavior as suspicious under the "no-look test," saying that most passengers will look at the officer

just as a show of respect and that it is suspicious if a passenger tries to ignore the officer or pretend that he is not there. Conversely, Hainline testified that Bartz, the passenger in the rear seat, was overly friendly, which also was suspicious behavior.

As he was talking to the vehicle's occupants, Hainline smelled a strong odor. Although he could not identify the scent, he agreed that it could have been food. Hainline testified that a strong odor, even if the smell could not be identified, was often indicative of the masking of drugs or drug use in the car.

Hainline took the information he had received and returned to his patrol car to check that defendant's driver's license was valid and to run a warrant check on everyone in the vehicle. He found that both Heather and Bartz had criminal histories, but defendant had none. Additionally, Hainline testified that he had previously received information from the West Central Illinois Drug Task Force that Heather was involved in illegal drug activity. However, defendant had a valid driver's license and proof of insurance, and no warrants were outstanding for any occupant, so Hainline exited his patrol car and approached the vehicle, this time from the driver's side. Hainline then asked defendant to exit his car and to join him at the rear of the car. Defendant complied, and Hainline talked briefly with him while he wrote out a warning ticket. Hainline

- 4 -

asked him where they were coming from and what they were doing. Defendant answered that they had been at a friend's house in Beardstown. When asked the name of the person they had visited, defendant did not answer. Hainline then issued the warning ticket to defendant and returned his insurance card and driver's license, informing him that he was free to go. Hainline testified that the reason he waited to question defendant about the contents of his vehicle until after he had returned his license and told him he was free to go was to prevent defendant from saying at trial that he did not feel he was free to leave at that moment.

There is some dispute as to whether defendant reentered the vehicle and was about to leave or whether he was simply returning to the vehicle, but after defendant had received his warning ticket, driver's license, and insurance card, Hainline asked him if they had any open alcohol in the vehicle. Defendant replied in the negative. Hainline asked him if any loaded guns were in the car. Defendant answered no. Hainline asked if any illegal drugs were in the car. Defendant testified he said no. However, Hainline testified that defendant did not provide an answer but instead looked down and away from him.

Hainline then asked for permission to search the vehicle. Defendant testified that he did not initially consent. Hainline testified that defendant gestured toward the car when he

- 5 -

first asked for consent. Hainline said that defendant verbally consented after he asked again. Hainline said that defendant then went to the car, said something to Heather and Bartz, and then Heather and Bartz got out of the car. Defendant, however, testified that he eventually consented after Hainline told him that he could keep them there until defendant consented and that a canine unit was nearby. Hainline denied telling them that he could keep them there until they consented. However, Hainline testified, "I think when I had all the passengers out of the vehicle I said something about other units being in the area, one may be a canine unit, not indicating there was." Hainline denied that he said this to make defendant feel as if he would be held there until a canine unit arrived unless he consented to a search.

When asked by defense counsel why he told defendant about the possible canine unit, Hainline said, "Sir I had three people out there. I was by myself. I said, there's other units out here. Have you guys seen any other units out here?" Defense counsel asked Hainline why he would ask the men in the car whether they had seen other units out that night. Hainline responded, "I have three subjects. It's 4:00 o'clock in the morning. They don't know, sir, that there's not other units out there, being state, county, whatnot." Defense counsel asked Hainline whether he meant to imply that he was concerned for his

safety. Hainline responded, "I think we have to take officer safety into consideration in the way we teach things, obviously. An ideal situation would be two officers on one subject would be minimal to handle people. Obviously, in my case, we had one county deputy and three subjects." Hainline agreed that neither defendant nor his codefendants had demonstrated any threatening behavior or words up to this point.

After Hainline received defendant's consent to search the car, he said he ordered the passengers out and frisked each of them, finding no weapons or contraband. Curiously, Hainline testified earlier that the men exited the car voluntarily after defendant consented and then went to the car and spoke to them. He then opened the passenger side door and began a vehicle search, which resulted in his finding a "one-hitter" pipe and a large bag of plant material, which later field tested positive for cannabis.

The trial court denied defendant's motion to suppress, finding that (1) the initial traffic stop was permissible, (2) a reasonable person in defendant's position would believe he was free to leave, (3) the detention was not improperly prolonged, and (4) Hainline had reasonable suspicion to ask for consent to search.

Before announcing its decision, the trial court stated: "The officer had given [defendant] back

all of his documentation, told him he was free to go, and then said, [']by the way, can I [search the car?']  And not any great amount of time had passed when that had occurred, just a matter of less than minutes, unlike the <u>Brownlee</u> case.  And unlike the <u>Brownlee</u> case, [defendant] did not say to the officer, [']do I have a choice?[']  And the officer had reason to ask for a consent to search, and the reason was that, perhaps not totally objective standards of eye contact, movement, unidentifiable odor, which probably could have been sweat socks, the name of the passenger who had a criminal record and whose name had been made known to the officer by members of the Drug Task Force, and the driver's inability to provide the name of friends that were visiting."

Following a stipulated bench trial, defendant was found guilty of unlawful possession of cannabis with intent to deliver. Defendant filed a posttrial motion, arguing the trial court erred in denying his motion to suppress.  On July 26, 2002, the court denied defendant's posttrial motion and sentenced defendant to 24 months' probation.  Defendant appealed the trial court's decision

to deny his motion to suppress, and this court reversed the trial court's ruling (Roberts, 349 Ill. App. 3d 972, 813 N.E.2d 748). On September 27, 2006, the Supreme Court of Illinois, by supervisory order, ordered this court to vacate that decision and review the case in light of the recent United States Supreme Court opinion in Caballes, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834, and Caballes III, 221 Ill. 2d 282, 851 N.E.2d 26.

In Caballes, defendant's motion to suppress was denied. There, during a routine traffic stop, the police allowed a dog to circle defendant's car and sniff the area around his car. The dog alerted, giving the officers probable cause to search. The defendant argued that the dog search violated his fourth amendment right to be free from unreasonable searches. U.S. Const., amend IV. The United States Supreme Court found that defendant had no expectation of privacy in the air surrounding his car. The Court held that a dog sniff is permissible, even absent reasonable suspicion to search, so long as it does not unreasonably prolong the length of the stop. The Court remanded the case to the Supreme Court of Illinois. In Caballes III, this state's supreme court held that the state constitution affords citizens the same protections as the fourth amendment, and the dog sniff was therefore permissible. However, Caballes III is not dispositive of the instant case. No canine unit ever arrived or conducted a sniff of defendant's vehicle.

However, our original opinion in this case focused on the Supreme Court of Illinois's decision in People v. Harris, 207 Ill. 2d 515, 802 N.E.2d 219 (2003). In Harris, the supreme court concluded that while asking for identification from the passengers in a car during a routine traffic stop was constitutionally permissible, running a warrant check on those individuals was not. However, the Supreme Court of the United States vacated the judgment in Harris and remanded it to this state's supreme court to review in light of the Supreme Court's decision in Caballes. Illinois v. Harris, 543 U.S. 1135, 161 L. Ed. 2d 94, 125 S. Ct. 1292 (2005) (referring to Caballes, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834). The supreme court has yet to issue its opinion in Harris on remand. Because of the uncertainty of the supreme court's review in Harris, this court is now compelled to reanalyze this case without reliance on Harris.

## II. ANALYSIS

### A. Standard of Review

When a trial court's ruling on a motion to suppress involves factual determinations or credibility assessments, the court's ruling will not be disturbed on review unless it is manifestly erroneous. People v. Sorenson, 196 Ill. 2d 425, 430-

31, 752 N.E.2d 1078, 1083 (2001). However, where the facts and witness credibility are not in dispute, the ultimate question posed by the legal challenge to the trial court's ruling on a motion to suppress is reviewed <u>de novo</u>. <u>Sorenson</u>, 196 Ill. 2d at 431, 752 N.E.2d at 1083.

B. Denial of Motion To Suppress

At issue in the instant case is whether the trial court erred in denying defendant's motion to suppress, finding (1) a reasonable person in defendant's position would have believed he was free to leave after the warning citation was issued and defendant's driver's license and insurance card were returned and (2) defendant was not unconstitutionally seized when Hainline questioned defendant after the traffic stop was complete.

Both parties acknowledge that the traffic stop was complete once Hainline returned defendant's driver's license and insurance card, handed defendant the warning citation, and told defendant he was free to leave. Defendant argues, however, that Hainline's later questions would make a reasonable person believe that he was not free to leave.

An officer does not have to explicitly inform the driver that he is free to go before asking for consent to search. <u>People v. Brownlee</u>, 186 Ill. 2d 501, 512, 713 N.E.2d 556, 562 (1999). However, where an illegal detention has occurred, a subsequent consent to search may be found to have been tainted by

the illegality. Brownlee, 186 Ill. 2d at 519, 713 N.E.2d at 565. The court must look at the "totality of the circumstances" to determine whether the driver's consent to search was validly given. Brownlee, 186 Ill. 2d at 514, 713 N.E.2d at 563, citing Ohio v. Robinette, 519 U.S. 33, 40, 136 L. Ed. 2d 347, 355, 117 S. Ct. 417, 421 (1996).

The relevant issue in this situation "'is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" People v. Luedemann, 222 Ill. 2d 530, 550, 556, 857 N.E.2d 187, 203 (2006), quoting Florida v. Bostick, 501 U.S. 429, 436, 115 L. Ed. 2d 389, 400, 111 S. Ct. 2382, 2387. Determining whether the defendant felt free to leave is analyzed from an objective standard by the court and is not construed literally. Luedemann, 222 Ill. 2d at 555, 857 N.E.2d at 202-03 (noting that the standard is not whether an individual "practically" or "realistically" felt free to leave).

The fact that a traffic stop is complete does not necessarily constrain a police officer from asking a vehicle's occupant for permission to search the car. People v. Ramsey, 362 Ill. App. 3d 610, 617, 839 N.E.2d 1093, 1103 (2005). In Ramsey, the stop was complete when the police officer returned defendant's license and insurance card and issued a warning citation. The issue posed by the court in Ramsey was "whether a

- 12 -

law-enforcement officer may, after the traffic stop is concluded, ask the driver whether he has anything illegal in his truck, and when the reply is negative, ask for permission to search." (Emphases in original.) Ramsey, 362 Ill. App. 3d at 622, 839 N.E.2d at 1104 (Knecht, J., specially concurring). This court found that although the officer prolonged the stop by asking the defendant whether he had anything illegal or unusual in his car and requesting permission to search, the questioning took mere seconds. The court concluded that the search in Ramsey was proper because the officer did not exhibit any behavior that would imply that the search he requested was mandatory. Ramsey, 362 Ill. App. 3d at 620, 839 N.E.2d at 1102. This court held that the officer's actions did not constitute a show of authority such that a reasonable person would not feel free to leave. Ramsey, 362 Ill. App. 3d at 617, 839 N.E.2d at 1100. "Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the [f]ourth [a]mendment." Immigration & Naturalization Service v. Delgado, 466 U.S. 210, 216, 80 L. Ed. 2d 247, 255, 104 S. Ct. 1758, 1763 (1984). However, this court in Ramsey cautioned, "An officer may ask, not demand or direct, and the driver may refuse to answer and be on his way." Ramsey, 362 Ill. App. 3d at 621, 839 N.E.2d

- 13 -

at 1103.

Without a show of authority by the police officer, defendant may be presumed to know that he is free to leave. United States v. Mendenhall, 446 U.S. 544, 553, 64 L. Ed. 2d 497, 508-09, 100 S. Ct. 1870, 1876-77 (1980). In Mendenhall, the Supreme Court listed four examples of circumstances that might indicate a seizure even where the person did not attempt to leave: "[(1)] the threatening presence of several officers, [(2)] the display of a weapon by an officer, [(3)] some physical touching of the person of the citizen, or [(4)] the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Mendenhall, 446 U.S. at 554, 64 L. Ed. 2d. at 509, 100 S. Ct. at 1877. In addition, Luedemann acknowledged that the Mendenhall examples, or factors, are not an exhaustive list of actions police officers may take that constitute a show of authority. Luedemann, 222 Ill. 2d at 556, 857 N.E.2d at 203.

The chronology of events after the stop is crucial. The discrepancies between defendant's and Hainline's testimony are material to determine the coercive nature of the encounter from an objective standard. If Hainline's encounter with defendant was coercive, defendant's consent would not be voluntary.

The uncontradicted facts in this case are that

defendant was told he was free to go; defendant was questioned about firearms, alcohol, and drugs; and defendant answered "no" when asked about firearms and alcohol. The facts in dispute are whether defendant refused to answer Hainline's question about drugs, whether defendant was in his car or outside of his car when Hainline questioned him and asked for his consent to search, whether Hainline asked defendant about other units nearby before he obtained defendant's consent to search, and whether Hainline implied the other nearby units were canine units.

Both defendant and his codefendant, Heather, testified that Hainline specifically said that there was a canine unit nearby and that he said this prior to obtaining defendant's consent. Hainline's testimony did not address this issue at all until cross-examination. On cross-examination, Hainline admitted that he made a comment to defendant about the possibility of other units being nearby; however, he did not testify as to whether he said this before or after defendant consented to the search.

It is the trial court's responsibility to "determine the credibility of witnesses and the weight given to their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from that evidence." People v. Singleton, 367 Ill. App. 3d 182, 187, 854 N.E.2d 326, 331 (2006), citing People v. Phelps, 211 Ill. 2d 1, 7, 809 N.E.2d 1214, 1218 (2004).

- 15 -

We will not reverse the trial court's findings of fact unless manifestly erroneous. <u>Sorenson</u>, 196 Ill. 2d at 430-31, 752 N.E.2d at 1083. However, the trial court did not make any explicit finding of fact regarding the events that occurred after the initial stop was complete.

If Hainline's comment about the nearby units came after defendant refused consent to search his vehicle, it would clearly suggest to defendant that his compliance with the officer's request could be compelled. The effect of telling a citizen who is not under arrest that a canine unit is nearby is coercive in nature. The fact that Hainline acknowledged that he said this because he was "outnumbered" indicates that Hainline intended the comment to be a show of authority. However, if defendant had already given his consent, the comment would be benign with regard to whether defendant's consent was voluntary.

Also, Hainline testified that during the stop he became aware that one of the passengers in defendant's vehicle, Heather, had been "involved" in illegal drug activity. However, Hainline questioned defendant, not Heather, after the stop was complete. Also, Hainline did not initially question defendant about drugs. First, he asked whether any alcohol or loaded weapons were in the vehicle. Defendant answered "no" to both of these questions. Hainline then asked if drugs were in the vehicle. Hainline contends that defendant refused to answer this question. Since

defendant was not being detained and was free to leave, he had the right to refuse to answer the officer. Florida v. Royer, 460 U.S. 491, 497-98, 75 L. Ed. 2d 229, 236, 103 S. Ct. 1319, 1324 (1983). Defendant's unwillingness to engage in conversation with the officer could be deemed by a fact finder to suggest that defendant was choosing not to voluntarily cooperate with Hainline.

After defendant refused to answer Officer Hainline's question about drugs, Hainline testified that he asked for consent to search defendant's vehicle. Defendant testified he refused. If defendant refused, there can be no doubt that the consensual nature of the officer's encounter with the defendant ended when defendant refused to answer the officer's question and refused the officer's request to search. People v. Ortiz, 317 Ill. App. 3d 212, 221, 738 N.E.2d 1011, 1019 (2000), citing Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). However, Hainline testified that although defendant did not verbally respond the first time he asked to search defendant's car, when he asked again defendant consented. Hainline did not testify that defendant said anything between the first and second time Hainline asked for defendant's consent.

Because it cannot be discerned from the record whether Hainline told defendant about the other nearby units before he obtained defendant's request to search, we defer to the trial

court's findings.  The trial court found that Hainline had reasonable suspicion to request consent to search based upon information Hainline acquired during the stop.  Although the trial court did not address whether Hainline mentioned calling a canine unit to the scene before obtaining defendant's consent, this testimony was before the court and it ruled in the State's favor.  Therefore, because the trial court's decision was not against the manifest weight of the evidence, we affirm.

### III. CONCLUSION

For the reasons set forth above, we affirm the trial court's denial of defendant's motion to suppress.

Affirmed.

KNECHT and COOK, JJ., concur.