# Illinois Official Reports

## Appellate Court

---

### *People v. Augusta*, 2019 IL App (3d) 170309

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. QUENNEL AUGUSTA, Defendant-Appellant. |
| District & No. | Third District<br>No. 3-17-0309 |
| Filed | November 6, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Knox County, No. 16-CF-7; the Hon. Paul L. Mangieri, Judge, presiding. |
| Judgment | Vacated and remanded. |
| Counsel on Appeal | James E. Chadd, Peter A. Carusona, Matthew Lemke, and Mark D. Fisher, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>John T. Pepmeyer, State's Attorney, of Galesburg (Patrick Delfino, Thomas D. Arado, and Chelsea E. Kasten, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE HOLDRIDGE delivered the judgment of the court.<br>Justice McDade specially concurred, with opinion.<br>Justice Carter dissented, with opinion. |

**OPINION**

¶ 1       The defendant, Quennel Augusta, appeals from his conviction for unlawful possession with intent to deliver a controlled substance. The defendant argues the circuit court of Knox County erred in denying his motion to suppress evidence because the arresting officers violated section 7-5.5(b) of the Criminal Code of 2012 (Code) (720 ILCS 5/7-5.5(b) (West 2016)) and the fourth amendment of the United States Constitution when they held him by the throat and forcibly removed suspected contraband from his mouth.

¶ 2                                        I. BACKGROUND

¶ 3       The State charged the defendant with one count each of unlawful possession with intent to deliver a controlled substance (720 ILCS 570/401(c)(2) (West 2016)), unlawful possession of a controlled substance (*id.* § 402(c)), obstructing justice (720 ILCS 5/31-4(a)(3) (West 2016)), and unlawful possession of cannabis (720 ILCS 550/4(b) (West 2016)).

¶ 4       Before trial, the defendant filed a motion to suppress evidence. At the hearing on the motion, defense counsel called Galesburg police officer Kyle Winbigler to testify. On January 3, 2016, shortly after midnight, Winbigler noticed the defendant's vehicle. Winbigler followed the defendant because he "wanted to get a stop because [he] thought [defendant] had narcotics." Eventually, Winbigler stopped the defendant for failing to use his turn signal. Winbigler's dash camera recorded the stop. It did not, however, record the traffic violation that led to the stop.

¶ 5       As Winbigler approached the driver's side window of the defendant's vehicle, he noticed that the defendant's cheek was "sticking out" as if he were chewing tobacco. Winbigler saw a piece of plastic in the defendant's mouth and asked the defendant to open his mouth. The defendant said that he did not have anything in his mouth. Winbigler directed the defendant to remove the plastic from his mouth, and when the defendant did not comply, Winbigler "grabbed" the defendant "below the jaw" to remove the plastic. Defense counsel sought to clarify Winbigler's description and asked:

"Q. Okay. Below my jaw is my throat.

When you say that below the jaw, did you take your hand, open hand, and did you bring that under his jaw around [defendant's] throat with your thumb on one side—

A. Basically, yes.

Q. —with your thumb on one side and your other finger or fingers on the other side; is that correct?

A. Basically, yes.

Q. Are you right-handed?

A. Yes.

Q. So you would have taken him, as you see me now, underneath my jaw and grabbed his throat; is that correct?

A. Yes.

Q. And at that point in time, what—you were grabbing his throat so that he would open his mouth so that you could inject your hand or yourself into his mouth to attempt to remove something; is that correct?

A. I was trying to stop him from swallowing the suspected—

Q. You reached in so you could get something out of his mouth; is that correct?

A. Not necessarily at that point. I wanted the item that was in his mouth out.

Q. So, in other words, you grabbed [defendant] by the throat because you believed something was in his mouth and you wanted it out of his mouth; is that correct?

A. Yes.

Q. You were unable to get it out of his mouth, and so Officer Tapscott then helped you; isn't that correct?

A. Yes.

Q. And I'm not certain in reading through the report, but it would appear from the report that Officer Tapscott got into the back of the vehicle?

A. Yes.

Q. And reached around and reached into [defendant's] mouth to remove the items that you stated were in his mouth; is that correct?

A. Yes."

After removing the object from the defendant's mouth, Winbigler placed the defendant under arrest.

¶ 6 On direct examination by the State, Winbigler testified that when he approached the defendant's vehicle, he smelled an odor of cannabis and saw an open bottle of beer and a plastic cup that appeared to contain an alcoholic beverage. Winbigler thought that the defendant was concealing crack cocaine in his mouth.

¶ 7 Officer Jared Tapscott testified that on January 3, 2016, Winbigler advised him that the defendant, who was suspected to be selling narcotics, was driving through Galesburg. Tapscott followed the defendant's vehicle until defendant turned. Thereafter, Winbigler initiated a traffic stop and radioed for assistance. Tapscott parked his patrol vehicle in front of the defendant's vehicle and stood near the rear of the vehicle while Winbigler spoke to the defendant. Tapscott shined his flashlight at the defendant and observed a clear plastic bag in the defendant's mouth. As Winbigler attempted to remove the bag from the defendant's mouth, Tapscott entered the rear driver's side seat to assist Winbigler. Tapscott placed his hand "around [defendant's] upper throat to prevent him from swallowing and tilted his back—his head back." Winbigler opened the driver's side door to "more easily assist with preventing the subject from swallowing." Tapscott then reached into the defendant's mouth and removed a clear plastic bag that contained off-white colored chunks of suspected crack cocaine. The removal process took less than one minute, and at the end, Winbigler placed the defendant under arrest.

¶ 8 Following the defendant's arrest, Winbigler and Tapscott conducted a search of the defendant's vehicle. Tapscott found a small plastic bag that he suspected to contain crack cocaine sitting on the driver's side floorboard. Tapscott also discovered an open bottle of beer and a can of Sprite that contained a hidden compartment. Tapscott found a plastic bag inside the hidden compartment. The bag contained approximately four grams of suspected cannabis.

¶ 9 During the State's direct examination, Tapscott explained that he held the defendant's jaw area or throat to prevent the defendant from choking on the plastic bag. Tapscott also recalled

that he smelled an odor of cannabis while he was in the defendant's vehicle. Tapscott also found suspected crack cocaine concealed inside the Sprite can.

¶ 10 Renee Devers testified that on the night of the defendant's arrest, the defendant drove her home from a local bar where she was drinking beer. While en route, the defendant used his turn signal before each turn. Devers noticed flashing red and blue lights, and the defendant pulled his vehicle to the side of the road. At the time, Devers had an open bottle of beer. Devers placed the bottle between the center console and driver's seat where it would be visible from the exterior of the vehicle. Devers denied smoking cannabis and did not smell an odor of cannabis in the vehicle at the time of the stop.

¶ 11 The defendant testified that he was driving Devers home when Winbigler initiated a traffic stop. Winbigler said the defendant had failed to signal before making a turn. The defendant denied the charge but asked if Winbigler wanted to see his driver's license and proof of insurance. Winbigler declined the defendant's offer and asked the defendant if he had something in his mouth. The defendant said he did not. Winbigler reached for his firearm and ordered the defendant to open his mouth. The defendant froze, and Winbigler reached through the window and started choking the defendant. A second officer pulled the defendant's neck back, and the defendant went into a state of shock.

¶ 12 On cross-examination, the defendant admitted that he had lied to Winbigler when he said that he had nothing in his mouth. The State then asked:

"Q. Well, let's—then let's back up. How did that baggie end up in your mouth?
***

A. I put it in there.
Q. Okay.
A. It had been in my mouth.
Q. And—and why did you put it in your mouth?
A. That's where I usually always have it.
Q. I'm sorry?
A. That's where I usually always have it.
* * *

Q. So is that where you carry the drugs that you have on your person—
***

A. Yes.
Q. —in your mouth?
A. Yes.
* * *

Q. So how far before Officer Winbigler came up did you put the stuff in your mouth?
A. It was in my mouth already before he even came—before he even pulled me over.
* * *

Q. Why were the items in your mouth bagged up as such? Why were there 14 individual packages inside of a bigger package in your mouth?

\*\*\*

A. It was just the way that I had it. It was given—"

During the remainder of the State's cross-examination, the defendant denied drinking alcohol and said he was unaware that Devers had a bottle of beer in the vehicle. Devers told the defendant that she had the bottle as Winbigler initiated the traffic stop. The defendant explained that he had a cup that contained Pepsi in the center counsel at the time of the stop. The defendant denied using cannabis prior to the stop and did not smell an odor of cannabis in the vehicle.

¶ 13       The court denied the defendant's motion to suppress, finding Winbigler's testimony to be credible. The court further found the traffic stop was based on Winbigler's observation that the defendant had failed to use his turn signal before making a turn and Winbigler had probable cause to believe that the defendant had contraband in his mouth, and therefore, had grounds to search the defendant's mouth.

¶ 14       The case proceeded to a stipulated bench trial, and the State amended the information to reduce count I from a Class X felony to a Class 1 felony. The State also dismissed the remaining counts, along with two related traffic tickets. The court found the defendant guilty of unlawful possession with intent to deliver a controlled substance and sentenced defendant to six years' imprisonment. The defendant appeals.

¶ 15                                        II. ANALYSIS

¶ 16       The defendant argues the court erred in denying his motion to suppress evidence because Winbigler and Tapscott violated section 7-5.5(b) of the Code and the fourth amendment when they grabbed him by the throat, pulled his head back, forced open his mouth, and reached inside to remove suspected contraband. The State responds that the seizure was lawful because section 7-5.5(b) of the Code does not apply to the facts of this case and the suspected contraband in the defendant's mouth was located in the officers' plain view. We find that the court erred in denying the defendant's motion because the seizure used to obtain the suspected contraband was unlawful and the plain view doctrine does not apply to the facts of this case.

¶ 17       We apply a two-part standard of review to the circuit court's ruling on the defendant's motion to suppress evidence. *People v. Harris*, 228 Ill. 2d 222, 230 (2008) (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). We review the circuit court's findings of fact for clear error and give due weight to any inferences drawn from those facts by the fact finder. *Id.* We will reject the court's findings of fact only if they are against the manifest weight of the evidence. *Id.* (citing *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001)). We review *de novo* the court's ultimate ruling as to whether suppression is warranted. *Id.*

¶ 18       The fourth amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Similarly, article I, section 6, of the Illinois Constitution provides that "[t]he people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means." Ill. Const. 1970, art. I, § 6. The "touchstone" of the fourth amendment analysis is always "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Terry v. Ohio*, 392 U.S. 1, 19 (1968). "[T]he 'reasonableness' of a particular seizure depends not

only on *when* it is made, but also on *how* it is carried out." (Emphases in original.) *Graham v. Connor*, 490 U.S. 386, 395 (1989). To determine whether the force used to effectuate a seizure is " 'reasonable' " under the fourth amendment, we must balance " ' "the nature and quality of the intrusion on the individual's Fourth Amendment interests" ' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985), quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).

¶ 19    While the reasonableness test that is used to determine if a seizure is lawful is not capable of a "precise definition or mechanical application" (*Bell v. Wolfish*, 441 U.S. 520, 559 (1979)), the Illinois legislature has codified both permitted types of force (720 ILCS 5/7-5 (West 2016)) and unpermitted types of force (*id.* § 7-5.5). Defendant argues that section 7-5.5(b) rendered the officers' use of force to seize his person unlawful. Section 7-5.5(b) states: "[a] peace officer shall not use a chokehold, or any lesser contact with the throat or neck area of another, in order to prevent the destruction of evidence by ingestion." *Id.* § 7-5.5(b). Both Winbigler and Tapscott testified that they held the defendant by his throat to prevent him from swallowing an object that was located in his mouth. While neither officer indicated that they employed a "chokehold" to restrain the defendant, their "lesser contact with the [defendant's] throat" was prohibited by section 7-5.5(b). Therefore, the officers' use of the prohibited contact rendered this physical seizure of the defendant unreasonable.

¶ 20    The State argues that section 7-5.5(b) does not apply to the instant case because the officers did not employ a "chokehold." The State's argument overlooks the second part of the section 7-5.5(b) disjunctive. This clause specifically forbids the use of "*lesser contact* with the throat or neck area of another" to prevent ingestion. (Emphasis added.) *Id.* Because both officers' testimony established that they made "lesser contact" with the defendant's throat during the seizure of defendant's person, the record conclusively establishes that they used impermissible force. Thus, section 7-5.5(b) applies to this case.

¶ 21    The State also argues that the officers could reasonably seize the object in the defendant's mouth because it was in plain view. The plain view doctrine permits a police officer to seize an object without a warrant during an investigative stop so long as (1) the officers are lawfully in a position from which they view the object, (2) the incriminating character of the object is immediately apparent, and (3) the officers have a lawful right of access to the object. *Minnesota v. Dickerson*, 508 U.S. 366, 374-75 (1993); *People v. Jones*, 215 Ill. 2d 261, 271-72 (2005).

¶ 22    We find that the plain view doctrine does not apply to this case. First, the incriminating character of the object was not immediately apparent. Winbigler testified that he saw a piece of plastic in the defendant's mouth and noticed a bulge in the defendant's cheek. While the appearance of plastic in an individual's mouth is unusual, it is not inherently incriminating. Additionally, the bulge in the defendant's cheek could easily be attributed to several other lawful activities like chewing tobacco or consuming food. Second, and more problematic, is the fact that the officers did not have a lawful right of access to the object. To gain access to the object in the defendant's mouth, both officers restrained defendant by making "contact with the [defendant's] throat." 720 ILCS 5/7-5.5(b) (West 2016). This contact was expressly prohibited by section 7-5.5(b), and its prohibition rendered the officers' access to the object unlawful. Therefore, because the officers used unpermitted force to access the object in the defendant's mouth, this seizure violated the fourth amendment and the court erred in denying the defendant's motion to suppress evidence.

¶ 23    Having found that the court erred in denying the defendant's motion to suppress, the defendant asks this court to vacate his conviction outright because, following the suppression of the unlawfully obtained evidence, the State will not have sufficient evidence to support a conviction for possession of cocaine with the intent to deliver. We decline the defendant's request. We find that the more prudent remedy is to vacate the defendant's conviction and sentence, reverse the circuit court's ruling on the motion to suppress, and remand for further proceedings. This remedy permits the State itself to decide whether it can further pursue the charges without the suppressed evidence.

¶ 24                              III. CONCLUSION

¶ 25    The judgment of the circuit court of Will County is vacated and remanded for further proceedings.

¶ 26    Vacated and remanded.

¶ 27    JUSTICE McDADE, specially concurring:

¶ 28    I agree with the judgment stated in the lead opinion, but I write separately because I would also find that the circuit court erred in denying defendant's motion to suppress evidence because the underlying traffic stop was a subterfuge to obtain evidence of a narcotics violation.

¶ 29    At the outset, I note that the record contains no physical evidence of the traffic violation that prompted Winbigler to stop defendant's vehicle. In fact, Winbigler acknowledged that his dash camera did not record the traffic violation. Therefore, the only evidence of a traffic violation, and the only grounds for the stop, came from Winbigler's testimony. This testimony is both undercut by Winbigler's own statements and rebutted by other evidence in the record.

¶ 30    Winbigler testified that he recognized defendant's vehicle and " 'wanted to get a stop because [he] thought [defendant] had narcotics.' " *Supra* ¶ 4. Winbigler's general belief that defendant might possess narcotics does not, by itself, justify stopping defendant's vehicle. See *People v. Hackett*, 2012 IL 111781, ¶ 20 (to support an investigatory stop, an officer must be able to point to "*specific and articulable facts* which, taken together with rational inferences from those facts, reasonably warrant the intrusion" (emphasis added)). Therefore, the only lawful grounds from the stop derived from the alleged turn signal violation.

¶ 31    From my review of the record, the turn signal violation that Winbigler purported to observe was a subterfuge to obtain evidence. This subterfuge was based on Winbigler's "hunch," and not specific and articulable facts, that defendant possessed narcotics. See *People v. Dionesotes*, 235 Ill. App. 3d 967, 970 (1992) (an officer's "hunch" that criminal activity was afoot is insufficient to warrant a traffic stop). This subterfuge is further established by Winbigler's radio notification to Tapscott that he had seen defendant driving in the area, and Winbigler and Tapscott's subsequent close observation of defendant as he drove through Galesburg. Ultimately, the officers' observation and following of defendant ended when Winbigler observed defendant commit the turn signal violation. Defendant rebutted Winbigler's testimony when he denied committing a turn signal violation. Defendant's testimony was corroborated by that of his passenger, Devers, who said that defendant used his turn signal before each turn. Given this record, I would hold that the circuit court's finding that Winbigler's testimony regarding the basis for the stop was credible to be contrary to the

manifest weight of the evidence. I otherwise agree with the conclusion of the lead opinion.

¶ 32    JUSTICE CARTER, dissenting:

¶ 33    I respectfully dissent from the majority's decision that vacates the circuit court's denial of defendant's motion to suppress evidence and remands the cause for further proceedings. I would affirm the circuit court's denial of defendant's motion and find that (1) Winbigler had reasonable suspicion to believe that defendant was concealing narcotics inside his mouth, (2) Winbigler and Tapscott acted reasonably in seizing this evidence, and (3) neither officer violated section 7-5.5(b) of the Code.

¶ 34    In this case, the police-citizen interaction began with a traffic stop and developed into searches of defendant's person and vehicle. For purposes of the fourth amendment analysis, a traffic stop is more analogous to the investigative stop described in *Terry*, 392 U.S. 1, than a formal arrest. *Berkemer v. McCarthy*, 468 U.S. 420, 439 (1984); *People v. Cosby*, 231 Ill. 2d 262, 274 (2008). A traffic violation does not provide grounds for an officer to search a citizen's person or vehicle. *Jones*, 215 Ill. 2d at 270. To broaden the stop into an investigative detention, an officer needs " 'specific, articulable facts which give rise to a reasonable suspicion that the defendant has committed, or is about to commit, a crime.' " *People v. Zayed*, 2016 IL App (3d) 140780, ¶ 21 (quoting *People v. Ruffin*, 315 Ill. App. 3d 744, 748 (2000)). An officer's hunch or unparticularized suspicion is not enough to justify broadening the stop into an investigatory detention. *Ruffin*, 315 Ill. App. 3d at 748.

¶ 35    Here, Winbigler observed defendant commit a traffic violation—defendant turned without using his turn signal. The traffic violation gave Winbigler grounds to conduct an investigative stop. When Winbigler approached defendant, the scope of the stop expanded as Winbigler noticed that defendant's cheek was sticking out as if he were chewing tobacco. Winbigler also saw a piece of plastic in defendant's mouth. These facts, combined with Winbigler's experience as a police officer, gave Winbigler reasonable suspicion to believe that defendant was concealing crack cocaine in his mouth. Given this suspicion, Winbigler reasonably expanded the scope of the stop to include an investigative detention that focused on whether defendant had crack cocaine concealed in his mouth. At this point in the interaction, the question arises of whether Winbigler and Tapscott could use force to search defendant's mouth. My analysis of this specific search is guided by Professor Wayne LaFave's discussion of the use of force to conduct a search of a person.

> "The police sometimes find it necessary to employ force in conducting a search of a person at the arrest scene. The usual case is one in which the arrestee has placed what appear to be drugs into his mouth, and the police then attempt to retrieve the drugs and prevent the arrestee from swallowing them. There is no doubt that the police are entitled to take some action *** in order to prevent loss of the evidence. 'A suspect has no constitutional right to destroy or dispose of evidence by swallowing, consequently he cannot consider the mouth a "sacred orifice" in which contraband may be irretrievably concealed from the police.' " 3 Wayne R. LaFave, Search and Seizure § 5.2(i), at 179 (5th ed. 2012) (quoting *State v. Williams*, 560 P.2d 1160, 1162 (Wash. App. Ct. 1977)).

¶ 36    LaFave's discussion is partially reflected in the justifiable use of force article of the Code. Section 7-5 specifically provides that an officer "is justified in the use of any force which he *reasonably* believes to be necessary to effect the arrest and of any force which he reasonably believes to be necessary to defend himself or another from bodily harm while making the

arrest." (Emphasis added.) 720 ILCS 5/7-5 (West 2016). In contrast, section 7-5.5, which became effective on January 1, 2016, prohibits the use of certain specific types of force that might be employed by a peace officer. *Id.* § 7-5.5. Section 7-5.5 states, in its entirety:

"(a) A peace officer shall not use a chokehold in the performance of his or her duties, unless deadly force is justified under Article 7 of this Code.

(b) A peace officer shall not use a chokehold, or any lesser contact with the throat or neck area of another, in order to prevent the destruction of evidence by ingestion.

(c) As used in this Section, 'chokehold' means applying any direct pressure to the throat, windpipe, or airway of another with the intent to reduce or prevent the intake of air. 'Chokehold' does not include any holding involving contact with the neck that is not intended to reduce the intake of air." *Id.*

¶ 37    The plain language of section 7-5.5(b) contemplates two different uses of force: (1) a chokehold and (2) lesser contact with the neck. Reading section 7-5.5 as a whole, I note that this statute is primarily worded as prohibition on the use of chokeholds—contact to the neck that prevents an individual's intake of air.[1] 720 ILCS 5/7-5.5 (West 2016). In contrast to this broad prohibition, section 7-5.5(b) further restricts the use of "lesser contact" with the neck. *Id.* § 7-5.5(a), (b). Although section 7-5.5 does not define "lesser contact," the plain language of the statute establishes that it encompasses all contact with the neck that utilizes less force than the defined chokehold.

¶ 38    From my review of the record, I would find that the officers did not violate section 7-5.5(b) of the Code. This section specifically prohibits an officer's contact with a private citizen's throat "to prevent the destruction of evidence by ingestion." *Id.* § 7-5.5(b). This statute does not create an overall prohibition of an officer's general contact with a private citizen's throat or throat. An officer may still make contact with an individual's throat or throat so long as the force used is reasonable and applied for reasons other than to prevent the destruction of evidence. Ultimately, the determination of whether an officer's actions violated this statute turns on the officer's motivation in touching an individual's throat and, therefore, presents a question of fact.

¶ 39    I would find that the evidence in this case establishes that Winbigler and Tapscott made "lesser contact" with defendant's throat. However, this contact did not violate the statute as (1) it was not intended to prevent defendant from destroying evidence by ingestion and (2) the officers were engaged in a community caretaking duty to prevent defendant from suffering the ill effects of accidentally swallowing a mass quantity of crack cocaine.

---

[1]The statute does not contemplate the use of a hold or pressure to the neck that is intended to disrupt blood flow. Prior to the statutory definition of "chokehold," courts made no distinction between "chokeholds," and "respiratory restraints" or "carotid holds" and "vascular restraints." See Laura Rose Matteis, Note, *Stay Away From the Neck: Why Police Chokeholds and Other Neck Restraints Violate International Human Rights*, 38 T. Jefferson L. Rev. 101, 105-06 (2015). There are two main types of neck restraints: "carotid restraints" and "chokeholds." *Id.* at 106. Carotid restraints apply pressure to the carotid arteries, which are located on the side of the victim's neck. *Id.* at 107. The pressure causes the victim to lose consciousness as it decreases or occludes the flow of blood carrying oxygen to the brain. *Id.* In contrast, a chokehold, or respiratory restraint, applies pressure to the throat and trachea blocking the flow of oxygen to the victim's lungs. *Id.* at 108.

¶ 40 First, I would find that the record establishes that Winbigler reasonably believed that defendant had a mass quantity of crack cocaine concealed in his cheek. When defendant refused to open his mouth or spit the crack cocaine out, Winbigler used reasonable force to conduct a search for the narcotics. During his own testimony, defendant confirmed that he had crack cocaine in his mouth and further stated that this is the location where he usually carried crack cocaine. As LaFave notes, defendant did not have a right to conceal evidence in his mouth—it is not a so-called " 'sacred orifice.' " 3 Wayne R. LaFave, Search and Seizure § 5.2(i), at 179 (5th ed. 2012) (quoting *Williams*, 560 P.2d at 1162). By defendant's own admission, he was not ingesting the crack cocaine, and thus the officers' actions would not be preventing the destruction of evidence by ingestion and would not violate section 7-5.5. Therefore, I would conclude that Winbigler and Tapscott utilized reasonable force to open defendant's mouth and retrieve the crack cocaine concealed within.

¶ 41 Second, I note that Tapscott testified that he acted, at least in part, to prevent defendant from choking on the object in his mouth. At the time of the stop, defendant's cheek was bulging as if it contained a reasonably large object and plastic was sticking out of his mouth. This object posed two immediate threats to defendant's health: (1) the plastic could block defendant's airway and (2) the plastic, which the officers reasonably believed to contain narcotics, could break open and cause defendant to ingest 14 individual smaller bags of crack cocaine and perhaps suffer a narcotics overdose. Given these risks, I would find that Tapscott acted reasonably in securing defendant's head while Winbigler removed the crack cocaine from defendant's mouth and effectively eliminated these immediate risks to defendant's health.

¶ 42 Finally, I would find that even if the officers were motivated, at least in part, by the perception that defendant might be attempting to destroy evidence, this motivation was one of at least two expressed reasons for making contact with defendant's throat. Where, as in this case, the officers provide multiple reasons for their contact with defendant's throat, some lawful and some arguably violative of the statute, the fact finder must determine the officers' ultimate motivator. *Harris*, 228 Ill. 2d at 230. By denying defendant's motion to suppress, the circuit court implicitly found that the contact with defendant's throat was motivated primarily by the officers' community caretaking duties. As such, it did not constitute a violation of section 7-5.5(b). After reviewing the record, I do not find the court's conclusion to be contrary to the manifest weight of the evidence. Therefore, I would defer to this factual determination and conclude that the officers did not use unlawful force to obtain the narcotics from defendant's mouth.

¶ 43 Overall, I would find that the circuit court did not err in denying defendant's motion to suppress evidence.