2020 IL App (1st) 180875-U

SIXTH DIVISION
November 30, 2020

No. 1-18-0875

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 7716 |
| | ) | |
| DAVION WOODS, | ) | Honorable |
| | ) | Pamela M. Leeming, |
| Defendant-Appellant. | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Connors and Griffin concurred in the judgment.

**O R D E R**

¶ 1   *Held*: Armed robbery and aggravated discharge of a firearm convictions affirmed where evidence was sufficient to prove convictions beyond a reasonable doubt; armed robbery with personal discharge of a firearm conviction affirmed where the evidence supported finding that defendant shot at the victims' car in order to effectuate his escape; armed robbery with a firearm conviction vacated where trial court failed to merge that conviction with conviction for armed robbery with personal discharge of a firearm.

¶ 2   Following a bench trial, defendant Davion Woods was found guilty of two counts of armed

robbery and one count of aggravated discharge of a firearm. The trial court sentenced him to 26 years in prison for armed robbery with a firearm, 26 years in prison for armed robbery with personal discharge of a firearm, and 15 years in prison for aggravated discharge of a firearm, all to be served concurrently.

¶ 3    On appeal, Mr. Woods argues that the State presented insufficient evidence to support any of his convictions. Alternatively, he argues that his conviction for armed robbery with personal discharge of a firearm should be reversed because there is insufficient evidence that Mr. Woods fired the gun during the commission of the offense and that, if that conviction is not reversed, his conviction for armed robbery with a firearm should be vacated because it violates the one-act, one-crime doctrine. For the following reasons, we affirm Mr. Woods's convictions for armed robbery with personal discharge of a firearm and aggravated discharge of a firearm and vacate Mr. Woods's conviction for armed robbery with a firearm.

¶ 4                                I. BACKGROUND

¶ 5    Mr. Woods's convictions stem from events that occurred on March 23, 2017, at a gas station in Bellwood, Illinois, after which Mr. Woods was charged with robbing Alfredo Carreno at gunpoint. The case was presented in a one-day bench trial on February 14, 2018. Five witnesses testified for the State. The details as to what was alleged to have occurred came almost entirely from the testimony of the two victims, Mr. Carreno and Roberto Valle, who told essentially the same story but were inconsistent in some details.

¶ 6    At approximately 6 p.m. on March 23, 2017, Mr. Valle picked up Mr. Carreno from work. The two men drove to a currency exchange to cash Mr. Carreno's check for an estimated $320. They then drove to a Mobil gas station at the corner of 25th Avenue and St. Charles Road. Mr. Carreno testified that Mr. Woods, who neither man had met before, approached Mr. Carreno when

Mr. Carreno got out of the car and asked Mr. Carreno to buy him some "blunts"—which Mr. Carreno understood to be Swisher cigars—and Mr. Carreno agreed. Mr. Valle testified that Mr. Woods first approached them when they were already inside of the gas station, but agreed with Mr. Carreno that Mr. Woods wanted them to purchase Swishers.

¶ 7 Mr. Carreno testified that after he had grabbed snacks and the Swishers and walked up to the counter to pay, Mr. Woods handed him the money for the Swishers "under the waist" so the clerk could not see. When Mr. Carreno paid for the items, he pulled out all of the money he had received when he cashed his check at the currency exchange. Mr. Woods was standing right behind him at that time.

¶ 8 Both Mr. Carreno and Mr. Valle testified that, after exiting the gas station, Mr. Woods tried to get into the back seat of Mr. Valle's car, but Mr. Carreno stopped him and told him to pull around the corner where Mr. Carreno would give him the Swishers. Mr. Carreno testified that he did not want to exchange the Swishers at the gas station because he was not from the neighborhood and did not want to "get in trouble" for buying the Swishers for Mr. Woods. He and Mr. Valle testitied that they had seen that the clerks in the gas station did not want to sell Swishers to Mr. Woods. According to Mr. Carreno, Mr. Woods gave him his phone number and told Mr. Carreno to give him a call if he ever needed anything, then Mr. Woods returned to a silver car with four or five other people inside.

¶ 9 Mr. Valle and Mr. Carreno drove around the corner onto 24th Avenue and parked the car halfway down the block. When Mr. Woods did not arrive right away, Mr. Carreno called the number that Mr. Woods had given him. According to Mr. Carreno, Mr. Woods answered the call and said he was on his way.

¶ 10 Eventually, Mr. Carreno saw the silver car Mr. Woods had entered pull out of an alley

behind them and park a few houses behind Mr. Valle's car. Mr. Carreno testified the car was "packed" with four or five people in it. Mr. Valle testified that he only saw two people in the car. Both testified that Mr. Woods and another man, who had a hoodie pulled tightly around his face, exited the silver car and got into Mr. Valle's car. Both testified that, when Mr. Carreno reached back to give Mr. Woods the Swishers, Mr. Woods said, "[d]o you want to die tonight?" and pointed a gun with a flashlight attached to it at Mr. Carreno's head. Mr. Carreno testified that Mr. Woods pointed the gun at the side of his head, knocking his hat off, while Mr. Valle testified that Mr. Woods pointed the gun at the back of Mr. Carreno's head. Both men testified that Mr. Woods said "[g]ive me what you got in your pockets" so Mr. Carreno gave Mr. Woods his cash and the items he had purchased in the gas station. Mr. Carreno testified that the gun was a black-gray Glock with a flashlight attached to the barrel, which he recognized because he had previously owned a Glock. Mr. Carreno also testified that the light on the barrel of the gun was so bright that he was forced to turn away. Both men testified that Mr. Woods then told them to "[g]et the f*** out my hood" and exited the car with the gun still pointed at Mr. Carreno's head. Mr. Carreno testified that Mr. Woods took "four steps back" from Mr. Valle's car, fired his gun at the car, and then ran back to the silver car he arrived in. Mr. Valle testified that Mr. Woods was about 5 to 10 feet away from the rear of the car when he fired his weapon. Both men testified that Mr. Valle then drove off.

¶ 11    Mr. Carreno and Mr. Valle drove around the area for an unspecified period of time before contacting the police. Bellwood police officer James Michelli testified that at some time around 6 or 7 p.m., the police were contacted and he met the two men in a school parking lot on 25th Avenue and Oak Street.

¶ 12    Both Mr. Carreno and Mr. Valle testified that when they reported what had occurred to Officer Michelli they reported that Mr. Woods had fired at the trunk of the car. However, as

4

discussed more fully in the description of the defense witnesses, Officer Michelli, who did not testify for the State, contradicted Mr. Carreno and Mr. Valle's statements and testified that neither of the men told him that a gun had been fired at Mr. Valle's car. Mr. Carreno testified that he did not examine the car for a bullet hole the evening of March 23. However, Mr. Valle testified that he, Mr. Carreno, and Officer Michelli all examined the car for the bullet hole in the parking lot that night, but that "it was raining real bad" and dark out.

¶ 13    At trial, the State introduced three photographs of the trunk of Mr. Valle's vehicle showing a bullet hole, which Mr. Valle testified were taken by a private investigator in October 2017. Both Mr. Valle and Mr. Carreno testified that the exhibits accurately depicted Mr. Valle's car on March 23 after Mr. Woods had fired at the trunk. Mr. Valle testified that there were no holes in the trunk of his car before he drove to the Mobil gas station that night.

¶ 14    Mr. Valle testified that, on March 24, 2017, he opened his trunk and found the bullet after hearing metal rattling around and told the police about the bullet hole when they called him the following morning. Mr. Valle testified that he drove to Mr. Carreno's house to show him the bullet hole. Mr. Carreno testified, instead, that he went to Mr. Valle's house to see the bullet hole and also that he took a photo of it with his "other" cell phone. No photos from that phone were presented at trial.

¶ 15    Bellwood police detective Warren Hernandez, who was assigned to investigate the case, confirmed that Mr. Carreno told him about the bullet hole in Mr. Valle's trunk when they spoke the morning of March 24, 2017. He also testified that he met with Mr. Carreno at the police station the evening of March 23, 2017, and showed him a "mug book" of photos, but Mr. Carreno did not identify anyone. Mr. Carreno denied looking at a mug book at all on March 23, 2017.

¶ 16    Bellwood police officer Belcore retrieved video surveillance footage from the Mobil gas

station on March 23, 2017, and Bellwood Master Sergeant John Trevarthen reviewed screenshots from the surveillance footage and recognized Mr. Woods from prior contacts with him. The officers and Mr. Carreno all testified that Mr. Carreno returned to the police station on March 24, 2017, and identified Mr. Woods in a photo array as the individual who robbed him. Mr. Carreno testified that both Detective Hernandez and Bellwood police detective John Setlak were in the room when he looked through the photo array, but both detectives testified that only Detective Setlak was in the room.

¶ 17    The parties stipulated that Detective Hernandez would testify that he ran a check on the (708) 262-4806 phone number, which was the number that Mr. Woods was alleged to have given to Mr. Carreno, and no subscriber could be identified.

¶ 18    Mr. Woods was arrested on May 2, 2017. After being given *Miranda* warnings, Mr. Woods agreed to speak to Detectives Hernandez and Setlak about the evening of March 23. During the interrogation, which was videotaped and submitted as evidence at trial and included in the record on appeal, Mr. Woods admitted to meeting two Hispanic men in the gas station in question, asking them to purchase Swishers for him, and later buying weed from one of the men. Detective Hernandez testified that Mr. Woods identified himself in the photos from the video surveillance footage and told officers that the men also asked Mr. Woods if he wanted to buy a gun but he declined.

¶ 19    According to Mr. Woods, the two men then left the gas station and turned down 24th Avenue. Mr. Woods followed a few cars behind, and then they drove separate ways. Mr. Woods repeatedly denied meeting the two men around the corner and consistently told the officers that his interactions with the two men ended at the gas station.

¶ 20    Mr. Woods's trial counsel moved for a directed finding at the end of the State's case-in-

chief, which the trial court denied. Four witnesses then testified for the defense.

¶ 21    As stated above, Officer Michelli testified that neither Mr. Valle nor Mr. Carreno told him any weapon was fired and that they did not inspect Mr. Valle's car for a bullet hole the evening of March 23. He also said there was no mention of a gun being fired in his report.

¶ 22    Alfonzia Matthews—Mr. Woods's stepbrother, Lauren Miller—the mother of Mr. Woods's child, and Bianca Woods—Mr. Woods's sister all testified that they were in the car with Mr. Woods at the gas station on March 23, 2017.

¶ 23    Bianca Woods testified that in the early evening of March 23, 2017, Mr. Matthews, Ms. Miller, and Mr. Woods picked her up from her home and drove to the Mobil gas station on 25th Avenue and St. Charles Road to purchase Swishers. They all testified that they intended to smoke marijuana that evening. Mr. Matthews testified that they drove to a Marathon gas station in his red Cadillac. All three witnesses testified that Mr. Woods exited their car and entered the gas station.

¶ 24    Ms. Woods testified that when Mr. Woods came out, he was with two men she had never seen before, and all three men got into a black car. Mr. Matthews and Ms. Miller testified that there was only one man with Mr. Woods when they exited the gas station, and that they both got into a black car. Ms. Woods and Ms. Miller testified that they saw the driver of the car get something out of the trunk, which they could not see, and then return to the driver's seat. Mr. Matthews, however, testified that the other man got something out of the trunk first before getting into the car with Mr. Woods.

¶ 25    All three witnesses testified that Mr. Woods then returned to Mr. Matthews's car with weed, and Ms. Woods testified that Mr. Woods said, "[l]ook at all this weed I got for $30." Ms. Woods testified that Mr. Woods was holding about three-and-a-half grams or an "eight ball" of weed. Mr. Matthews testified that Mr. Woods returned to the car with what he first described as

fourteen grams and later describes as about seven grams of weed.

¶ 26    All three witnesses testified that Mr. Woods had no interaction with the men in the other car anywhere but at the gas station and that at no point did Mr. Woods have a gun on him. According to the defense witnesses, after Mr. Woods got back in their car at the gas station, they went straight to Ms. Miller's house to smoke the "blunts." The defense witnesses also testified that the only cell number that they knew Mr. Woods to have was (630) 430-0509 and not the 708 number that had been identified as the number Mr. Woods had given to Mr. Carreno.

¶ 27    The court found Mr. Woods guilty of two counts of armed robbery and one count of aggravated discharge of a firearm. Mr. Woods's trial counsel moved for a new trial, which the court denied. The trial court stated that its intention was to give Mr. Woods the minimum possible sentence and it sentenced him to 26 years for armed robbery with a firearm, 26 years for armed robbery with personal discharge of a firearm, and 15 years for aggravated discharge of a firearm, to be served concurrently. Mr. Woods's motion to reconsider his sentence was denied.

¶ 28                                    II. JURISDICTION

¶ 29    Mr. Woods was sentenced on April 9, 2018, and timely filed his notice of appeal on April 27, 2018. We have jurisdiction pursuant to article VI, section 6 of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from final judgments of conviction in criminal cases.

¶ 30                                    III. ANALYSIS

¶ 31    On appeal, Mr. Woods argues the evidence was insufficient to prove beyond a reasonable doubt that he committed any of the charged crimes. Alternatively, if this court finds the evidence sufficient to support his convictions, he argues that his conviction for armed robbery with personal discharge of a firearm should be reversed where his gun was fired after the armed robbery was

complete. According to Mr. Woods, if we reverse only this conviction, this would result in a sentence-reduction to 21 years because the trial court indicated that it desired to give him the minimum possible sentence. He also argues that if we do not reverse the personal discharge conviction, his conviction for armed robbery with a firearm should be vacated, because the two convictions violate the one-act, one-crime doctrine. We address each of these issues in turn.

¶ 32                          A. Sufficiency of the Evidence

¶ 33    Mr. Woods first argues that we should reverse all of his convictions because the testimony of Mr. Carreno and Mr. Valle, on which the State built its case, was unbelievable, inconsistent, and contradicted by some of the testimony of the investigating officers. While we agree that the testimony of Mr. Carreno and Mr. Valle has weaknesses that Mr. Woods identifies, Mr. Woods simply cannot  meet the high burden required to overturn his convictions on appeal.

¶ 34    The due process clause of the fourteenth amendment guarantees that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof–defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979); see also U.S. Const. amend. XIV; Ill. Const. 1970, art. 1, § 2; *People v. Collins*, 106 Ill. 2d 237, 261 (1985). When determining whether trial evidence is sufficient to sustain a conviction, a court must ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson*, 443 U.S. at 319. This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." (Internal quotation marks omitted.) *People v. Brown*, 2013 IL 114196, ¶ 48. Although determinations made by the trial court are not conclusive, they

can be reversed only "where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of [the] defendant's guilt." *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007).

¶ 35 Mr. Woods argues that Mr. Carreno and Mr. Valle's testimony was so unbelievable that no reasonable trier of fact could have found Mr. Woods guilty of armed robbery and aggravated discharge of a firearm based on their testimony. Mr. Woods outlines specific aspects of this testimony that he argues particularly undermined the credibility of these key witnesses: the claim that Mr. Carreno told Mr. Woods to meet him around the corner instead of giving him the Swishers in the gas station parking lot where Mr. Carreno also testified that he had never been to that part of Bellwood and was anxious about being in an unknown area; the fact that Mr. Woods did not take their cell phones or anything at all from Mr. Valle; Mr. Carreno's and Mr. Valle's claim that they could testify as to the make of the gun despite the light attached to the gun; the unidentified man that these witnesses claimed accompanied Mr. Woods during the robbery; the contradictions surrounding the bullet hole and when they reported a gun being fired; and testimony regarding Mr. Carreno's activities at the Bellwood Police Department on March 23 and 24. While these contradictions exist, even collectively they do not make the testimony of Mr. Carreno and Mr. Valle *so* unbelievable that no reasonable finder of fact could have accepted it. We address each contradiction briefly.

¶ 36 We appreciate Mr. Woods's point that it is odd that Mr. Carreno wanted to exchange the Swishers around the corner at night in a strange neighborhood, rather than in the better-lit gas station parking lot, particularly where he had already purchased the Swishers in full view of the gas station employees. However, it was undisputed that the gas station had a video surveillance system and that could have motivated his concern. We cannot say that no reasonable trier of fact

could accept Mr. Carreno's testimony on this point.

¶ 37    Similarly, it is not completely improbable that a robber might be so singularly focused on the $320 in cash that Mr. Carreno revealed he had on him at the gas station, that nothing else was taken.

¶ 38    We acknowledge, as Mr. Woods argues, that it appears no second person was charged in this crime and no effort was made to identify this second man who both Mr. Carreno and Mr. Valle claimed accompanied Mr. Woods. But both of these witnesses testified that the man who accompanied Mr. Woods during the robbery had a hoodie pulled tight around his face, obscuring his features. Thus, we cannot find it inherently unreasonable for the police to not pursue him.

¶ 39    We also agree that there was indeed quite a bit of contradictory evidence regarding Mr. Woods firing the gun and supposedly leaving a bullet hole in the car. In contrast to Mr. Valle and Mr. Carreno, Officer Michelli testified that neither Mr. Carreno nor Mr. Valle said anything about Mr. Woods firing the gun the night of the incident and that he did not look for a bullet hole in the car that night. Mr. Woods also points to Mr. Carreno and Mr. Valle's inconsistent testimony as to where they met to allegedly look at the bullet hole in the car on March 24. However, the State introduced a photo of the bullet hole at trial that was taken by an investigator in October 2017, and it was uncontradicted that Mr. Carreno eventually told the police about the shooting. In sum, this testimony is not so contradictory or inherently unbelievable that no rational trier of fact could have found these witnesses to be credible.

¶ 40    Mr. Woods is correct that Mr. Carreno's testimony about what happened when he went to the Bellwood police station on March 23 and again on March 24 was contradicted in part by the police. Mr. Carreno claimed that he did not view a mug book on March 23, while Detective Hernandez testified he did. Mr. Carreno said Detectives Hernandez and Setlak were both in the

room during the photo lineup on March 24, but both detectives said that only Detective Setlak was in the room. However, these inconsistencies are minor and not related to the incident itself. "Minor inconsistencies in the testimony between witnesses or within one witness'[s] testimony may affect the weight of the evidence but does not automatically create a reasonable doubt of guilt." *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 62.

¶ 41  In short, it is the role of the trier of fact to assess the demeanor and determine the credibility of witnesses (*People v. Sorenson*, 196 Ill. 2d 425, 431, 752 N.E.2d 1078 (2001)), and appellate courts do not retry defendants (*People v. Evans*, 209 Ill. 2d 194, 209 (2004)). Here, the trial court's credibility determinations, made with knowledge of the inconsistencies and contradictions, are simply not so unreasonable as to require reversal. While these weaknesses and inconsistencies are present, they do not allow us to substitute our judgment for that of the trier of fact or provide a basis for reversing Mr. Woods's convictions.

¶ 42                               B. Discharge of the Firearm

¶ 43  Mr. Woods next argues that this court should reverse his conviction for armed robbery with personal discharge of a firearm because the robbery was complete before Mr. Woods fired his weapon.

¶ 44  The parties disagree as to which standard of review applies. Mr. Woods argues that this is "a purely legal" issue warranting *de novo* review, while the State argues that this is a mixed question of law and fact because the dispute is "whether, given the facts of this case, the armed robbery was complete at the time the defendant discharged the firearm." We agree that this is a mixed issue of law and fact.

¶ 45  An individual commits armed robbery with personal discharge of a firearm when "he or she, during the commission of the offense, personally discharges a firearm." 720 ILCS 5/18-2(a)(3)

12

(West 2016). For the purposes of armed robbery, the commission of the offense ends "when force or threat of force causes the victim to part with possession or custody of property against his will." *People v. Dennis*, 181 Ill. 2d 87, 102 (1998). However, any force used to aid in flight or to help effectuate escape "continues the commission of the offense." *Id.*

¶ 46     Mr. Woods argues that, based on the testimony of the State's witnesses, the robbery was complete when he stepped out of the car because Mr. Carreno had parted with his property and the threat of force had ended. Mr. Woods concedes that force used to effectuate an escape can constitute a continuation of the armed robbery, however, he argues that the gun was not fired to effectuate an escape because Mr. Carreno and Mr. Valle did not pursue him in any way. Instead, Mr. Woods argues that the most that can be said is that he fired the gun purely to "intimidate" Mr. Carreno and Mr. Valle.

¶ 47     The State responds that the case law does not carve out an exception for "the use of force where it may be argued it was not even necessary" and that "[a] reasonable inference can be drawn that [Mr. Woods] shot at [Mr.] Valle's vehicle in order to effectuate an escape and scare both [Mr.] Valle and [Mr.] Carreno before they could call the police."

¶ 48     We agree with the State that, under these facts, it was reasonable for the trial court to find that Mr. Woods shot to effectuate his escape. Mr. Woods has failed to provide this court with any case law to support his contention that an offender needs to be pursued to use force to effectuate escape, and it is not unreasonable for the trier of fact to have concluded that Mr. Woods shot at the car to ensure he escaped before Mr. Valle and Mr. Carreno had a chance to call the police. The testimony at trial was that Mr. Woods pointed his gun at Mr. Carreno, asked for his money and items purchased at the store, exited the car saying "get the f*** out of my hood," and shot within steps of leaving the car. Viewing the evidence, as we must, in the light most favorable to the

13

prosecution, we cannot say that no reasonable trier of fact could have found that Mr. Woods shot to effectuate his escape. *Jackson*, 443 U.S. at 319.

¶ 49                                    C. One-Act, One-Crime

¶ 50    Finally, Mr. Woods argues—and the State agrees—that the trial court violated the one-act, one-crime rule when it failed to merge Mr. Woods's convictions for armed robbery with a firearm and armed robbery with personal discharge of a firearm. Mr. Woods failed to raise this issue in a post-trial motion. However, a one-act, one-crime violation is reviewable under the second prong of plain error because it "affects the integrity of the judicial process." *In re Samantha V.*, 234 Ill. 2d 359, 378-79 (2009). Plain error review begins by determining whether any error occurred. *People v. Herron*, 215 Ill. 2d 167, 187 (2005).

¶ 51    "The one-act, one-crime rule prohibits convictions for multiple offenses that are based on precisely the same physical act." *People v. Smith*, 2019 IL 123901, ¶ 13. Courts use a two-step analysis in determining whether the one-act, one-crime doctrine has been violated. *People v. Rodriguez*, 169 Ill. 2d 183, 186 (1996). First, the reviewing court must analyze "whether the defendant's conduct involved multiple acts or a single act." *People v. Miller*, 238 Ill. 2d 161, 165 (2010). An act is defined as "any overt or outward manifestation which will support a different offense." *People v. King*, 66 Ill. 2d 551, 556 (1977). If multiple convictions stem from the same act, the one-act, one-crime doctrine is violated. *Miller*, 238 Ill. 2d at 165. If the court determines multiple acts were involved, it moves on to the second step in the analysis, determining whether "any of the offenses are lesser-included offenses." *Miller*, 238 Ill. 2d at 165. In this context, courts apply the abstract elements approach (*People v. Coats*, 2018 IL 121926, ¶ 30), under which an offense is lesser-included "if all the [statutory] elements of one offense are included within the second offense and the first offense contains no element not included in the second offense" (*Smith*,

2019 IL 123901, ¶ 37). If one offense is a lesser-included offense of the other, the less serious offense is vacated. *Id.*

¶ 52    Here, Mr. Woods's conduct for the more serious crime involved multiple acts: taking Mr. Carreno's property and personally discharging a firearm. Accordingly, we move on to the second step in the analysis and determine whether one of Mr. Woods's convictions for armed robbery is a lesser-included offense of the other under the abstract elements approach. *Miller*, 238 Ill. 2d at 165. Armed robbery with a firearm requires that the offender (1) violated the Illinois robbery statute (720 ILCS 5/18-1 (West 2016)) and (2) "carrie[d] on or about his *** person *** a firearm." 720 ILCS 5/18-2(a)(2) (West 2016). Armed robbery with personal discharge requires that the offender (1) violated the Illinois robbery statute (720 ILCS 5/18-1 (West 2016)) and (2) "during the commission of the offense, personally discharge[d] a firearm." 720 ILCS 5/18-2(a)(3) (West 2016). Because possessing a firearm is inherent in personally discharging a firearm, all of the elements of armed robbery with a firearm are included in armed robbery with personal discharge of a firearm, making it a lesser-included offense. The trial court's failure to merge the two counts of armed robbery was plain error and we therefore vacate Mr. Woods's conviction for armed robbery with a firearm.

¶ 53                                IV. CONCLUSION

¶ 54    For the reasons above, we affirm the judgment of the trial court in part, and vacate the conviction for armed robbery with a firearm.

¶ 55    Affirmed in part, and vacated in part.