2026 IL App (2d) 240644
No. 2-24-0644
Opinion filed February 27, 2026

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,
v. DUSTIN MOLITOR, Defendant-Appellant.

Appeal from the Circuit Court of Kane County.
Honorable Donald M. Tegeler Jr., Judge, Presiding.
No. 22-CF-2185

JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justices Hutchinson and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant, Dustin Molitor, appeals his conviction of unlawful possession of a controlled substance (fentanyl) (720 ILCS 570/402(c) (West 2020)). He argues that the trial court erred by denying his motion to suppress the contents of his wallet, which the police seized and searched while detaining him in response to a report of a theft at a retail store. Because we agree with defendant that the removal and search of his wallet exceeded the scope of a permissible pat-down search, we reverse.

¶ 2                                    I. BACKGROUND

¶ 3     On August 23, 2023, the State filed an indictment charging defendant with unlawful possession of a controlled substance. The indictment alleged that defendant "knowingly and unlawfully possessed less than 15 grams of a substance containing fentanyl, a controlled substance, other than as authorized by the Controlled Substances Act."

¶ 4    On April 18, 2024, defendant filed a motion to suppress evidence. The motion alleged as follows. On November 23, 2022, Aurora police officers responded to a report of a retail theft in progress. When officers approached defendant at the scene, he denied that he had taken any items, and he volunteered his backpack for a search. The officers then advised defendant that they would perform a pat-down search of defendant for weapons. While performing the pat-down, an officer recovered a wallet from defendant's front sweatshirt pocket. The officer placed the wallet back into defendant's pocket without opening it. However, a second officer asked for the wallet. Without obtaining defendant's consent, the second officer searched the wallet and found that it contained a controlled substance. Defendant was then arrested.

¶ 5    Defendant argued that although the initial stop was lawful under *Terry v. Ohio*, 392 U.S. 1, 21 (1968), the pat-down search was unlawful at its inception because there was no evidence that defendant possessed a weapon or posed a threat to the officers. Moreover, even if the pat-down search was lawful, the search of the wallet was unlawful because it was obvious that the wallet "was not a weapon and did not contain a weapon." Nor was there any alternative legal basis for the search of the wallet: defendant did not consent to the search, and he was not under arrest at that point. Defendant concluded that the contents of the wallet were the result of an unlawful search and must be suppressed as the fruit of the poisonous tree.

¶ 6    On May 21, 2024, the court conducted a hearing on defendant's motion to suppress evidence.

¶ 7    Officer Levi Vervynck testified first as follows. At the time of the incident on November 23, 2022, Vervynck had been a field training officer for about two months and was being supervised by Officer Tyler Johnson. That evening, Vervynck, Johnson, and Officer Michael Slaasted reported to a Dollar General store in connection with a retail theft. Once inside the store,

they encountered defendant. Vervynck wore a body camera. Defendant "interacted" with Vervynck, but Vervynck could not recall whether defendant gave consent to search the backpack he was carrying. After Vervynck agreed that his memory was exhausted, he was allowed to review the incident report. After reviewing it, Vervynck confirmed that defendant consented to a search of his backpack. When asked if defendant "consent[ed] to the search of anything else," Vervynck replied, "He did not." At this point, the State played a video of the officers' interaction with defendant as captured by the body cameras worn by Vervynck and Slaasted.

¶ 8     The four-minute video consists of a split screen of Vervynck's bodycam footage and Slaasted's bodycam footage. The video shows Vervynck, Johnson, and Slaasted entering the Dollar General and approaching the checkout lane, where defendant was standing. Defendant's cell phone rang, and he answered it. Defendant told the caller that someone had said he had put something in his backpack. However, defendant said, "I didn't," and that he did not know what was going on. When Vervynck asked the Dollar General employee at the checkout lane where the suspect was, she pointed to defendant and said, "So he walked out the bag beeped. He walked in the bag didn't beep. He walked out the bag beeped." Defendant then opened his backpack and showed it to Vervynck, saying, "You can look through it." Vervynck stated, "I'm just gonna pat you down real quick, make sure you don't got any weapons. Keep your hands out of your pockets." Vervynck then directed defendant to place his hands on the back of his neck. Vervynck moved defendant away from the checkout lane to another part of the store. Defendant denied taking anything. Johnson then motioned toward Slaasted, who was holding the backpack, and defendant agreed to a search of his backpack. When Vervynck pulled a wallet out of defendant's front sweatshirt pocket, defendant said, "That's my wallet and my card. I'm trying to pay for my food. I think this is bull***." Vervynck then put the wallet back in defendant's pocket and asked if defendant had

an ID in the wallet. Defendant replied, "Huh?" Vervynck repeated the question, and defendant replied, "Yeah, no. I don't actually." Vervynck asked, "You don't?" Defendant replied, "No." As defendant began to slightly lower his right elbow, Vervynck instructed him to keep his hands up. Defendant continued to deny taking anything. Johnson advised Vervynck to "[g]et that wallet again." Vervynck retrieved the wallet, unfolded it, and pulled out a loose card. Vervynck handed the items to Johnson. Johnson looked at the card and asked defendant if his name was "Dustin," to which defendant answered, "Yeah." Defendant then stated, "You don't need to look through my wallet, bro. It's my money and my, I, I lost my wallet the other day." Defendant then confirmed his birth date. As Slaasted searched the backpack, he removed a bowl pipe and a small plastic bag from a side pocket and then placed the items back into the backpack. Johnson then told Vervynck to place defendant in handcuffs. Pointing to the wallet, Johnson asked, "What is this in there?" Defendant replied, "It's just medicine." Defendant put his hands behind his back, and the video ended.

¶ 9    After the video was played, Vervynck resumed testifying. Vervynck acknowledged that he brought defendant out of the customer line at the Dollar General and did a pat-down search. The purpose of the pat-down search was to "make sure there were no weapons or—yeah, no weapons on him." Vervynck confirmed that he was conducting a *Terry* stop. Asked the purpose of that stop, Vervynck replied, "Initially for weapons, but we were responding to a retail theft." The search of defendant's person did not reveal any stolen items related to the reported retail theft, but Vervynck could not recall if any stolen items were found in defendant's backpack. When asked if he grabbed defendant's wallet out of his pocket "three times in that video," Vervynck answered, "I saw at least once, yes." Vervynck did not remember what he did with defendant's wallet "[t]he first time [he] saw it." Vervynck "might have opened" the wallet, but he could not recall if he saw anything inside.

Vervynck did not find any weapons or anything that could be conceived as a weapon on defendant, and he did not believe that defendant was a threat to anyone in the Dollar General. Vervynck agreed that Johnson was "ultimately the one that asked [Vervynck] to give [Johnson] the wallet."

¶ 10    On cross-examination, Vervynck admitted that he ultimately failed police training and was no longer employed with the Aurora Police Department. Vervynck then testified further regarding the incident. The 911 call dispatched the officers to the Dollar General because of a retail theft. When the officers arrived, the store employee "indicated who the suspect was that she believed was taking merchandise from the store." Vervynck agreed that, as a trainee, he was following Johnson's orders. Vervynck brought defendant back behind the food aisle and conducted a pat-down search. During the search, Vervynck was looking for weapons and possible proceeds of a retail theft. Vervynck agreed that "something like a gift card could have been in a wallet" and that this gave him reason to check the wallet. Vervynck followed Johnson's order to give him the wallet. Vervynck recalled that the store employee said that the alarm went off when defendant left with his backpack, but that when he returned with the backpack, the alarm did not go off. The employee also reported that a customer believed she saw defendant putting store items into his backpack. When Slaasted searched defendant's backpack, Slaasted pulled out a plastic bag of cannabis and a bowl pipe for smoking cannabis. Vervynck agreed that the possession of cannabis "would just be a—like a local ordinance fine or could be a ticket," whereas possession of "the pipe could be possess [*sic*] of drug paraphernalia," which was a misdemeanor and would authorize defendant's arrest. Vervynck agreed that "both of those"—the cannabis and the bowl pipe—gave him probable cause to continue searching defendant.

¶ 11    On redirect examination, Vervynck admitted that the dispatch mentioned that "something may have been put in a bag" but did not mention that gift cards had been taken from the store.

Defendant did not give permission to search his wallet. Based on the bodycam video, Vervynck believed that Slaasted searched the backpack and found the "paraphernalia first and then what was found in the wallet was found after that." Vervynck agreed that he did not have "confirmation at the time that [he was] searching [the] wallet of what, if any, paraphernalia or drugs were in" defendant's backpack. Defendant was not being investigated for drugs at the time of the search.

¶ 12    Slaasted testified next as follows. On November 23, 2022, he, Johnson, and Vervynck responded to a retail theft at a Dollar General store. Slaasted was wearing a body camera at the time. The officers encountered defendant and told him why they were called to the scene. Defendant gave consent to search his backpack. Slaasted searched the backpack and did not find any store merchandise.

¶ 13    On cross-examination, Slaasted testified that he found a bowl pipe and a "[g]reen leafy plant-like substance" in defendant's backpack. The substance was consistent with cannabis, and Slaasted agreed that the bowl pipe was "typically used to smoke cannabis."

¶ 14    On redirect examination, Slaasted testified that he placed the pipe and leafy substance back in defendant's backpack. Slaasted was notified that there was "something found in [defendant's] wallet," but he could not recall whether that was "before or after" he completed his search of defendant's backpack.

¶ 15    On recross-examination, Slaasted agreed that after he completed his search of defendant's backpack, defendant was placed under arrest.

¶ 16    Johnson testified next as follows. On November 23, 2022, Johnson was supervising Vervynck when they were called to a Dollar General store for a retail theft. Slaasted also joined them. After brief contact with a Dollar General employee, the officers made contact with defendant, who consented to a search of his backpack. Johnson instructed Vervynck to "check the

subject [defendant]," and Slaasted checked defendant's backpack. The purpose of Vervynck's "checking" of defendant's person was to locate any "proceeds" from the retail theft. Vervynck found no theft proceeds or weapons on defendant's person. At the time, Johnson had no fear for officer safety. Defendant was cooperative "[f]or the most part." He provided his name and later his birth date.

¶ 17    Asked again about the pat-down, Johnson testified that when Vervynck found the wallet, Johnson asked for it because "defendant had given some indication and queues [*sic*], some body language behavior that was raising [Johnson's] suspicion about the wallet." When questioned about "some of those queues [*sic*]," Johnson stated:

> "He [defendant] mentioned it at least two or three times on his own without being asked about the wallet. Stated something about it had been stolen or had been lost. When Officer Vervynck was patting him down for weapons, he took the wallet out. Defendant said, oh, yeah, yeah, yeah, that's my wallet; looking at it intensely.

> At one point, when Officer Vervynck was continuing to pat him down and reached the area where the wallet was, [defendant's] arm came down almost to like motion to go towards the wallet. [Defendant] had to be redirected to put his hand back up. So those were raising my suspicions that there may be something in that wallet."

Johnson admitted that the officers were at the store not to search for drugs but for store items that might have been taken. No store items were found in defendant's backpack or on his person. Defendant's backpack contained some cannabis and some "cannabis smoking pipes." These items were taken into evidence at the police department and were not tested at the scene. Defendant was not charged with possession of cannabis or drug paraphernalia; he was charged only with possession of a controlled substance.

¶ 18    Regarding his search of defendant's wallet, Johnson testified that it was a "multi-fold wallet" with "different inserts and pockets," which "needed to be checked." Johnson did not find any gift cards or other store items in defendant's wallet. When asked if he was looking for "drugs specifically in the wallet," Johnson answered, "At that time, no." The wallet had a zipper or snap pouch, which was closed. When Johnson opened that compartment, he found "the drugs." Those drugs were field tested at the scene, but the cannabis was not field tested until it was brought to the police department.

¶ 19    On cross-examination, Johnson testified that he had been a police officer for 10 years and, at the time of the incident, had supervised 10 to 12 officer recruits. When the officers arrived at the Dollar General, the employee described defendant as the "one that had possibly taken things in his bag." The officers then "kind of directed [defendant] over to a separate area of the store to speak with him." Initially, defendant "was on the phone speaking to someone, and *** he had been mentioning his wallet to whoever he was talking to on the phone." Defendant mentioned to the officers that his wallet had been "lost or stolen." Johnson was asked if the Dollar General employee told Johnson "that she heard anything about [defendant] talking about his wallet." Johnson replied, "I believe she did mention something about a wallet that she had overheard." When Johnson was asked if the incident report stated that he "overheard [defendant] on the phone saying he had forgotten his wallet," Johnson answered, "Okay. It was forgotten."

¶ 20    Johnson testified that, upon encountering defendant, the officers explained to him that they were there to see if defendant "had concealed anything" in his backpack or on his person. At some point, Johnson asked defendant for an ID:

"When I asked him if he had an ID in his wallet and he stated yes and then no that he did not have an ID in the wallet, which again was another thing that, you know, was mounding [*sic*] my suspicion that he was trying to distance himself from the wallet."

¶ 21 Although defendant was "overall cooperative," he "did seem agitated or irritated that we were having *** contact with him." When asked about whether defendant's "hands kept moving," Johnson answered:

"At one point during the pat down, you know, we teach to [*sic*] have, you know, the defendants place their hands, you know, behind their head this way. At one point, he brought his hand down without being instructed to while Officer Vervynck was completing his, you know, pat down."

About the significance of defendant lowering his hand during the pat-down, Johnson explained: "[I]t was his right hand where the wallet was in the pocket. So, to me, I believe that he was trying to go to the wallet to make sure that it stayed where it was." Although Johnson's "purpose in searching the wallet was to check for proceeds from the retail theft," he felt "in that zipped or buttoned portion of the wallet *** a bulge, like a hard mound bulge." When Johnson proceeded to "see what that bulge was," he discovered "small clear plastic bags of a powdery substance inside that portion of the wallet." Johnson suspected that the substance was narcotics.

¶ 22 Johnson further testified that once Slaasted found a bag of cannabis and a bowl pipe in the backpack, defendant could have been either ticketed or placed under arrest. However, defendant was not arrested until after the cannabis and bowl were found in the backpack *and* the narcotics were found in the wallet. He was arrested for possession of a controlled substance. When Johnson asked defendant about the substance in his wallet, defendant claimed that it was "medicine."

¶ 23 On redirect examination, Johnson was asked further about the search of defendant's person:

"Q. When you conducted the search of [defendant] with Officer Vervynck, the purpose—what was the purpose of that search?

A. To locate any proceeds.

Q. And were there any other purposes for that search?

A. No.

Q. Was there a pat down then?

A. Pat down in conjunction with a search, yes.

Q. What was the purpose of the pat down?

A. Initial pat down is just for weapons. We may do that when we initially make contact with someone if we're speaking in a close proximity or things like that.

Q. On his person, *** was any merchandise found?

***

A. No.

Q. On his person, were any weapons found?

A. No.

Q. And when you conducted the search of his wallet, what was the purpose of that search?

A. To look for any proceeds, but simultaneously, as I had mentioned before, his behavior, things he was doing were raising my suspicion about the wallet.

Q. Did you conduct the search of his wallet before or after reported cannabis was found in his bag?

A. The exact timing of it, I don't know because it was simultaneously I was dealing with the wallet as Officer Slaasted was looking in the backpack.

Q. *** Was your search of the wallet due to the contents in his bag?

A. Not entirely, no.

Q. Can you elaborate on that?

A. As I mentioned, his interaction when I had the wallet, he's focused intently on my looking at the wallet. He's breathing heavy, inching in closer to me. I had to have him back up because he was inching closer to me as I had his wallet. That's leading me to believe that there is something in the wallet, whether it's contraband, drugs, weapons, I don't know. But it's leading me to believe there is something in the wallet that he is concerned about."

When asked what a "bulge" in a wallet typically means, Johnson stated that he had "located similar drugs in similar parts of wallets before" and had "seen other officers locate similar drugs in similar parts of wallets."

¶ 24    After the State's motion for a directed finding was denied, the parties presented argument. The State argued that the officers had "reasonable and articulable suspicion of *** defendant," who was identified by the Dollar General employee as the perpetrator of a retail theft. The officers detained defendant "based on that suspicion" and then "simultaneously found a bag of cannabis and drug paraphernalia in the side pocket of the defendant's backpack." According to the State, "everything [was] kind of happening simultaneously." Slaasted found the cannabis and the paraphernalia, "then Officer Johnson f[ound] the drugs in the wallet and then the defendant [was] placed under arrest." According to the State, the search of the backpack happened "simultaneously" with the search of defendant's person. When the cannabis and paraphernalia were found, the wallet was in Johnson's hand. Johnson was looking for gift cards but then "f[elt] the bags of drugs in the wallet."

¶ 25    The State argued alternatively under the inevitable-discovery doctrine, an exception to the exclusionary rule. See *People v. Alexander*, 2021 IL App (2d) 180193, ¶ 47. The State reasoned that, even if the pat-down search was improper, the officers had probable cause to arrest defendant for possession of the drug paraphernalia in the backpack, and, in the process of arresting and booking defendant, the officers would have discovered the drugs in the wallet.

¶ 26    At this point, the trial court interjected that it was not convinced that the inevitable-discovery doctrine would apply, given that defendant was *not* arrested for the items found in the backpack.

¶ 27    Defense counsel argued as follows. The search of defendant's wallet "exceeded what [Johnson] could do" while investigating a retail theft. According to defendant, Johnson testified that he was not "necessarily looking for merchandise" in the wallet—and Johnson ultimately did not find any. In any event, gift cards were not something to steal because "you have to have money put on them." In addition, all of the officers testified that they were not concerned about officer safety, "[s]o patting [defendant] down was already going too far in this case." Defendant distinguished this case from the decisions cited by the State, in which "an arrest was already made before the search occurred."

¶ 28    The trial court denied defendant's motion to suppress. The court reasoned as follows. The officers "received a 911 call and the only thing [the court] heard was that there was a retail theft in progress." The store employee informed the officers that a customer "may have said that the defendant was placing things in his bag, that he went out, it beeped, he came back, it didn't beep." At that point, the officers were investigating an ongoing retail theft. The officers then approached defendant, who consented to a search of his backpack. "At that point, the officers also pretty much simultaneously begin a pat down search" of defendant. The first officer (Vervynck) testified that

he conducted a *Terry* stop for weapons and that "he did not find any weapons and he was not concerned." The other officers testified that they were "looking for *** weapons and/or contraband." Cannabis and paraphernalia were found in defendant's backpack. Although the paraphernalia made defendant subject to arrest, there was "no question they never arrested [defendant] for that."

¶ 29 The trial court framed the question as whether the pat-down search exceeded the officers' authority. The court determined that the officers "did have a right to pat [defendant] down. They ha[d] a right to pat him down for contraband and/or weapons at that point." The court noted that "defendant ha[d] made comments when he was on the phone that he either misplaced his wallet, something to that effect. So there was not a wallet supposedly present." When the officers patted defendant down, they "fe[lt] in the pocket a square object that may or may not be a wallet, may or may not be contraband." The court did not think "anyone in the [*sic*] right imagination would consider what they felt would be a weapon," and, "[i]n fact, the officer said they [*sic*] didn't think there was a weapon."

¶ 30 The trial court continued:

"The question is do they have right to go into the pocket to see what that is. I believe they do because they're investigating a retail theft and looking for contraband and, at this point, they are aware the defendant said he misplaced or forgot his wallet or it was stolen, one of the three. So he should not have a wallet on him based upon those comments. I find those are unsolicited comments by the police at that time not subject to [*Miranda v. Arizona*, 384 U.S. 436 (1966)], mainly because he's not placed under arrest when he makes those comments.

They have a right to take the wallet. At that point, I believe they have a right to open the wallet to determine who owns it since he wasn't supposed to have a wallet based upon his comment. They asked if he was Dustin. He said he was and they're able to confirm that is him. That doesn't quite get us to the end.

The officer—the last officer testifies that while opening the wallet, he felt a bulge in a—not locked, but in a zipped or clipped I'll say portion of the wallet and he felt a bulge in that wallet that, based upon his training as a police officer—he believed based upon training and past experience, he believed would be contraband based upon the bulge. Therefore, he opens it and he finds the controlled substance.

So the question this court has is did he exceed his authority in opening that zipped portion. I'll say it's zipped. The zipped portion of the wallet. He knew who the defendant was because he had already identified him. He knew it was the defendant's wallet. I find that based upon the officer's testimony, which I found credible, is that [*sic*] based upon his experience, that feel would lead one to believe contraband might be present. Therefore, he had a right to look and when he looked, he had found contraband and placed the defendant under arrest thereafter.

Therefore, the arrest I find was proper based upon the officer's actions in this case. ***."

¶ 31 The trial court concluded its ruling by stating:

"[B]ecause I find that the officers had a right to pat down the defendant for contraband, that when they found what they felt was a square object [that] could have been contraband, they had a right to look at it. Once they realized it was a wallet and the defendant said he didn't have it, they had a right to open it and based upon his—the officer's training and

expertise in the area, he believed he found contraband and doesn't have to ignore it. He can go in and see if, in fact, it was contraband. It was. He was arrested. Therefore, the motion will be respectfully denied."

¶ 32 A stipulated bench trial occurred on September 12, 2024, after which defendant was found guilty of unlawful possession of a controlled substance and sentenced to 12 months' conditional discharge.

¶ 33 Defendant filed a motion for a new trial, which the trial court denied.

¶ 34 This timely appeal followed.

¶ 35                        II. ANALYSIS

¶ 36 At issue in this appeal is whether the trial court properly denied defendant's motion to suppress the contents of his wallet.

¶ 37 In reviewing a trial court's ruling on a motion to suppress evidence, we apply the two-part standard of review adopted by the United States Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699 (1996). *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006).

"Under this standard, a trial court's findings of historical fact should be reviewed only for clear error, and a reviewing court must give due weight to any inferences drawn from those facts by the fact finder. [Citation.] In other words, we give great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence. [Citation.] A reviewing court, however, remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions when deciding what relief should be granted. [Citation.] Accordingly, we review *de novo* the trial court's ultimate legal ruling as to whether suppression is warranted." *Id.*

- 15 -

¶ 38    The fourth amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. "Reasonableness under the fourth amendment generally requires a warrant supported by probable cause." *People v. Johnson*, 237 Ill. 2d 81, 89 (2010). Indeed, "[a] search conducted without a warrant is considered *per se* unreasonable under the fourth amendment unless it falls within one of a limited number of exceptions to the warrant requirement." *People v. Brooks*, 2017 IL 121413, ¶ 27.

¶ 39    The sole exception the State invokes to justify the warrantless search of defendant's person and wallet is the exception recognized in *Terry*, 392 U.S. at 20. See *Johnson*, 237 Ill. 2d at 89 ("The Supreme Court recognized a limited exception to the traditional warrant requirement in *Terry* ***.").

> "In *Terry*, the Court held that a brief investigatory stop, even in the absence of probable cause, is reasonable and lawful under the fourth amendment when a totality of the circumstances reasonably lead the officer to conclude that criminal activity may be afoot and the subject is armed and dangerous." *People v. Colyar*, 2013 IL 111835, ¶ 32 (citing *Terry*, 392 U.S. at 30).

¶ 40    The Supreme Court in *Terry* explained the basis for its holding:

> "[W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to

take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24.

¶ 41 Construing *Terry*, our supreme court has explained that while a police officer's need to protect himself from danger is important, the government's interest must be balanced with the fourth amendment rights of an individual citizen to be free from unreasonable searches and seizures. *Colyar*, 2013 IL 111835, ¶ 35. In the *Terry* Court's view, "the proper balance was to afford law enforcement officials 'a narrowly drawn authority' to permit a reasonable search for weapons when the officer has reason to believe that the subject of his investigation is armed and dangerous." *Id.* (quoting *Terry*, 392 U.S. at 27).

¶ 42 "Under *Terry*, an officer may briefly detain a person if the officer reasonably believes that the person has committed, or is about to commit, a crime." *People v. Baker*, 2020 IL App (2d) 180300, ¶ 17. "If the officer reasonably believes that the person stopped is armed and dangerous, the officer may subject the person to a limited search for weapons, commonly referred to as a ' "frisk." ' " *Id.* (quoting *People v. Flowers*, 179 Ill. 2d 257, 262 (1997), citing *Terry*, 392 U.S. at 24). "The *Terry* principles have now been codified in our Code of Criminal Procedure of 1963." *People v. Sorenson*, 196 Ill. 2d 425, 433 (2001); see 725 ILCS 5/107-14, 108-1.01 (West 2020). In order for a frisk, *i.e.*, a pat-down search for weapons, to be constitutionally reasonable, "(1) the stop must be proper, (2) the officer must have reason to know that the defendant is armed and dangerous, and (3) the scope of the search must be strictly limited to a search for weapons." *People v. Davis*, 352 Ill. App. 3d 576, 580 (2004) (citing 725 ILCS 5/108-1.01 (West 2002), and citing *Sorenson*, 196 Ill. 2d at 432-33, 439-40).

¶ 43 This court has explained that whether an investigatory stop is valid is a separate question from whether an ensuing frisk is valid. *Baker*, 2020 IL App (2d) 180300, ¶ 18; see *Davis*, 352 Ill.

App. 3d at 580 ("[T]he right to frisk [the] defendant did not automatically follow from the fact that the stop was proper."). "The sole justification for the search is to protect the police officer and others in the vicinity, not to gather evidence." *Baker*, 2020 IL App (2d) 180300, ¶ 18 (citing *Flowers*, 179 Ill. 2d at 263). Therefore, the scope of the search is strictly limited to a search for weapons. *Id.* "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. But the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. "When reviewing the reasonableness of an officer's conduct, it is appropriate to give due weight to 'the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience.' " *Colyar*, 2013 IL 111835, ¶ 36 (quoting *Terry*, 392 U.S. at 27).

¶ 44    Defendant does not challenge the initial stop in this case. He challenges only the ensuing frisk, or pat-down, which he claims was "unlawful from its inception." He argues that it was "objectively unreasonable for the officers to believe they were in danger or that [defendant] was armed with a weapon," given that "[t]he only crime being investigated was [a] retail theft." To further this argument, defendant points out that the dispatch did not mention anyone being armed and that the officers testified they did not fear for their safety or believe that defendant was a threat to them or anyone else in the Dollar General. Defendant concludes that because there were no specific, articulable facts supporting a concern for safety, no frisk was permissible. In this regard, defendant takes issue with the trial court's determination that the frisk was lawful because the officers "ha[d] a right to pat [defendant] down for contraband *and/or* weapons." (Emphasis added.)

Defendant argues that the court's reasoning "was contrary to law" in that police were allowed to frisk defendant "only for weapons, not contraband generally."

¶ 45      We agree with defendant that based on the principles of law stated above, the scope of an officer's pat-down must be limited to a search for weapons, not the gathering of evidence, such as contraband. See *Davis*, 352 Ill. App. 3d at 580 (the right to frisk the defendant did not automatically flow from the fact that the initial stop was proper; rather, the officer must reasonably believe that the defendant is armed and dangerous). Here, Vervynck testified that he conducted a pat-down search of defendant for weapons. We note that the bodycam footage confirms Vervynck's testimony, in that Vervynck advised defendant, "I'm just gonna pat you down real quick, make sure you don't got any weapons." While it is seriously doubtful that a pat-down search should have occurred at all, we assume, *arguendo*, that the pat-down was proper at its inception. We face then the issue of whether the subsequent removal and search of defendant's wallet exceeded the scope of a permissible pat-down search.

¶ 46      On this point, we agree with defendant that this court's decision in *People v. Pratcher*, 332 Ill. App. 3d 1063 (2002) is instructive. In *Pratcher*, the defendant was stopped for a traffic violation. *Id.* at 1064. The officer obtained the defendant's driver's license, returned to his squad car, and asked the dispatcher to check the validity of the license. *Id.* at 1064-65. As the defendant waited in his car, the officer observed him rapidly pivot and lean forward in the driver's seat several times as if he were trying to exit the car. *Id.* at 1065. In addition, the officer observed the defendant thrust himself toward the front passenger floorboard, as if he were trying to grab something. *Id.* After learning that the defendant's driver's license was not suspended or revoked and that there were no outstanding warrants, the officer asked the defendant to step out of the vehicle and put his hands on the roof, so that the officer could conduct a pat-down search. *Id.* The officer conducted a

pat-down search of the defendant's clothing. *Id.* "Upon reaching [the] defendant's left front pants pocket, from the outside of the pocket and through [the] defendant's clothing, [the officer] felt what he believed was a quantity of cannabis in the pocket." *Id.* The officer thought it was cannabis because " 'it was tightly compressed, soft, pliable. It appeared contained because [the officer] wasn't able to spread it out.' " *Id.* When the officer asked the defendant if he (the officer) could take the item out of his pocket, the defendant said he would remove the item himself. *Id.* The defendant pulled out a plastic bag containing a substance that later tested positive for cannabis. *Id.*

¶ 47    The defendant argued that the officer's pat-down search exceeded the permitted scope of such a search. *Id.* at 1066. The defendant cited *Minnesota v. Dickerson*, 508 U.S. 366 (1993), where (we recounted), the Supreme Court "commented that the continued exploration of the defendant's pocket by the officer after he concluded that the pocket did not contain a weapon was unrelated to the sole justification of a *Terry* search, *i.e.*, the protection of the police and others." *Pratcher*, 332 Ill. App. 3d at 1068 (citing *Dickerson*, 508 U.S. at 378). Applying *Dickerson*, the defendant argued that the officer exceeded the permitted scope of the search "when, upon feeling the object in [the] defendant's left front pants pocket, [the officer] squeezed, slid, and otherwise manipulated the contents of the pocket through [the] defendant's clothing." *Id.* at 1067.

¶ 48    This court agreed that the officer's search of the defendant's pocket was improper. *Id.* at 1069. We noted that the officer testified he believed the object in the pocket was cannabis—not a weapon—based on its feel. *Id.* Thus, after the officer had concluded that there were no weapons in the pocket, "he nonetheless continued his search of the pocket's contents to determine the nature of the object that he felt." *Id.* This violated the fundamental principle of stop-and-frisk that " '[a]s soon as the officer is satisfied that an object is not a weapon, a further search to determine the nature or identity of the object is impermissible.' " *Id.* at 1068 (quoting *People v. Mitchell*, 165 Ill.

2d 211, 228 (1995)). Therefore, we concluded that the officer's search went beyond the permissible limits for such a search under *Dickerson*.

¶ 49 The search here was similarly improper in its scope. Both Vervynck and Johnson testified that they had no fear for their safety while interacting with defendant. They also testified that the pat-down search of defendant revealed no weapons. Yet, though rightly convinced that the wallet itself was not a weapon, Johnson believed that defendant's demeanor warranted a search of the wallet to see if it *contained* a weapon. The trial court, however, found that the wallet presented no potential threat. In any event, the State does not argue that the wallet was properly searched as a potential threat. Even if the State did so argue, we would not disturb the trial court's finding and would thus conclude that Johnson had no valid safety concern about the wallet when the officers removed it a second time from defendant's person and searched it. By any sound *Terry* analysis, the search of the wallet was impermissible. See *Baker*, 2020 IL App (2d) 180300, ¶ 18 (the *sole* justification for a pat-down search under *Terry* is to protect the police officer and others in the vicinity, *not* to gather evidence).

¶ 50 The State, rather than claim that the wallet was a potential safety threat, argues that the search of the wallet was proper because defendant "made suspicious claims and *** disclaimed ownership of [the wallet]," thus relinquishing any expectation of privacy in it. According to the State, defendant can be heard on the bodycam video telling Johnson, "You don't need to look through my wallet, bro. *It's not mine anyway*. I lost my wallet the other day." (Emphasis added.) Thus, the State claims, where defendant's "unsolicited statements made to [the] officers suggested that he possessed a stolen wallet, officers were correct to seize and search" it. In sum, the State seeks to distinguish *Pratcher* because defendant's comments gave the police reason to believe that the wallet was "possible stolen property."

¶ 51    The State's arguments are unpersuasive. As defendant points out, the bodycam footage does not contain a statement in which defendant denies that the wallet is his. The State mishears defendant's comment on the bodycam video, which was: "You don't need to look through my wallet, bro. It's my money and my, I, I lost my wallet the other day." Indeed, defendant repeatedly refers to the wallet as belonging to him. Also, the bodycam footage does not support Johnson's testimony that the Dollar General employee referred to defendant's wallet.

¶ 52    Even more troubling are the trial court's factual findings regarding defendant's wallet. In particular, the court found that "defendant ha[d] made comments when he was on the phone that he either misplaced his wallet, something to that effect. So there was not a wallet supposedly present." According to the court, the removal of the wallet from defendant's pocket was lawful because the officers were "investigating a retail theft and looking for contraband and, at this point, they are aware the defendant said he misplaced or forgot his wallet or it was stolen, one of the three." The court reasoned that the officers had a right to take the wallet and open it "to determine who owns it since he wasn't supposed to have a wallet based upon his comment." Thus, the court's rationale for upholding the removal and search of the wallet appears to depend on defendant's statements to the effect that his wallet was either misplaced, forgotten, or stolen.

¶ 53    The bodycam footage does not support the trial court's factual findings. In particular, contrary to the trial court's determination, defendant did not mention his wallet to the caller on his cell phone. Nor did defendant state to the officers that his wallet was misplaced, forgotten, or stolen at the time of the incident. Rather, three times on the bodycam video, defendant refers to the wallet as "my wallet." And he states only that he "lost [his] wallet *the other day*." (Emphasis added.)

¶ 54    But even if accurate, the trial court's findings would not support a *Terry* search of the wallet. Significantly, when Vervynck first removed the wallet from defendant's pocket, he knew

that it was not a weapon—nor, as the trial court determined, could any reasonable person regard it as such. Thus, at that point—as Vervynck and Johnson acknowledged—there was no concern for officer or public safety. Nonetheless, after Vervynck placed the wallet back in defendant's sweatshirt, Johnson asked Vervynck for the wallet and searched it. Johnson testified that he searched the wallet to see if it contained stolen items. But the purpose of a pat-down search is to search for weapons, not evidence. See *Baker*, 2020 IL App (2d) 180300, ¶ 18. Therefore, the scope of the search exceeded what is constitutionally permissible under *Terry*, and we reverse the trial court's order denying defendant's motion to suppress.

¶ 55                                    III. CONCLUSION

¶ 56     For the reasons stated, we reverse the judgment of the circuit court of Kane County.

¶ 57     Reversed.

*People v. Molitor*, **2026 IL App (2d) 240644**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 22-CF-2185; the Hon. Donald M. Tegeler Jr., Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Christopher McCoy, and Lucas Walker, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward Psenicka, and Gabrielle Moore, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |